**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ——————————————— : | |
| CAROL M. HIGHSMITH, and : | |
| THIS IS AMERICA! INC., : | |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | 16 CIV. 5924 (JSR) |
| : | |
| GETTY IMAGES (US), INC., : | |
| LICENSE COMPLIANCE SERVICES, : | |
| INC., : | |
| ALAMY, INC., : | |
| ALAMY, LTD., and : | |
| JOHN DOES 1 TO 100, : | |
| : | |
| Defendants. : | |
| : | |
| ——————————————— : | |

**<u>PLAINTIFFS' COMBINED</u>**
**<u>MEMORANDUM IN OPPOSITION TO</u>**
**<u>DEFENDANTS' MOTIONS TO DISMISS</u>**

# TABLE OF CONTENTS

INTRODUCTION AND FACTUAL BACKGROUND .................................................... 1

ARGUMENT ..................................................................................................... 5

I.    FOR PURPOSES OF THE DEFENDANTS' MOTIONS, ALL
      WELL-PLEADED FACTS IN THE <u>FAC</u> ARE ACCEPTED AS TRUE. ............ 5

II.   MS. HIGHSMITH DID NOT INTENTIONALLY ABANDON ALL
      OF HER RIGHTS TO CONTROL HER PHOTOGRAPHS
      BY "DEDICATING" RIGHTS IN THEM TO THE PUBLIC ............................. 6

      A.  *The 1976 Copyright Act and BCIA Eliminated the Doctrine of Forfeiture,
          Leaving Expiration and Abandonment as the Only Doctrines Under
          Which a Work May Enter the Public Domain* ............................................ 8

      B.  *The Current Legal Standard to Evaluate the Intentional
          Abandonment of Copyright Derives from the Common Law* ...................... 10

      C.  *The <u>Instrument</u>, When Viewed as a Whole, Is Not Clear
          and Convincing Evidence of Intentional Copyright Abandonment,
          But Rather the Intent to Create the Equivalent of a
          "Creative Commons" or public license* ....................................................... 12

      D.  *Conflicting Language on the Library of Congress Website
          Is Not Clear and Convincing Evidence of An Intent to Abandon
          by Ms. Highsmith* ....................................................................................... 16

      E.  *The <u>FAC</u> Includes Additional Evidence of Ms. Highsmith's
          Intent to Have Reserved Her Rights* ............................................................ 18

      F.  *Case Law On Abandonment Does Not Support a Finding of
          Intentional Abandonment Here* .................................................................... 20

      G.  *The Defendants' Current Position Regarding the Copyright Status
          of the Highsmith Photos Lacks Credibility* ................................................. 24

      H.  *The Few Off-Point Cases Cited by the Defendants Do Not Support
          a Finding of Abandonment* .......................................................................... 28

      I.  *The <u>FAC</u> Demonstrates that Ms. Highsmith Intended to Provide
          an "Open Source" or "Creative Commons" License
          for Her Photographs* .................................................................................... 28

III.   THE DEFENDANTS PROPERLY STAND ACCUSED OF
       PROVIDING FALSE "COPYRIGHT MANAGEMENT INFORMATION"
       FOR AT LEAST 19,000 HIGHSMITH PHOTOGRAPHS ................................. 30

IV.    PLAINTIFFS' FALSE ADVERTISING CLAIMS ARE NOT PREEMPTED
       BY THE COPYRIGHT ACT ................................................................. 35

       A.  *The Defendants Violated Section 43(a)(1)(A) of the Lanham Act* ............... 36

       B.  *Defendants Also Separately Violated Section 43(a)(1)(B)*
           *of the Lanham Act* ......................................................................... 38

V.     PLAINTIFFS HAVE STANDING UNDER THE DMCA, LANHAM ACT,
       AND NEW YORK LAW ......................................................................... 40

VI.    PLAINTIFFS HAVE STATED A NEW YORK BUSINESS LAW CLAIM
       AND A NEW YORK COMMON LAW CLAIM ................................................ 41

VII.   ALAMY IS NOT IMMUNIZED BY THE COMMUNICATIONS
       DECENCY ACT OF 1996 BECAUSE IT IS
       AN "INFORMATION CONTENT PROVIDER." ................................................ 43

VIII.  LCS IS PROPERLY SUBJECT TO PERSONAL JURISDICTION
       IN NEW YORK ...................................................................................... 44

       A.  *LCS is Properly Accused of Acting as Getty's Alter Ego* ........................... 44

       B.  *This Court Also Has Independent Personal Jurisdiction over LCS* ............. 45

IX.    ALAMY INC. AND ALAMY LTD. ARE PROPERLY SUBJECT
       TO PERSONAL JURISDICTION IN NEW YORK ........................................... 50

       A.  *This Court Has Specific Jurisdiction over Alamy, Inc.'s*
           *Corporate Parent, Alamy Ltd.* ........................................................... 51

       B.  *This Court Also Has General Jurisdiction over Alamy, Inc.'s*
           *Corporate Parent, Alamy Ltd.* ........................................................... 55

CONCLUSION ........................................................................................... 55

# TABLE OF AUTHORITIES

**CASES**

*Abel v. United States*, 362 U.S. 217 (1960) ..................................................................... 15

*Agence Fr. Presse v. Morel*, 934 F. Supp. 2d 547 (S.D.N.Y. 2013) ................................ 32, 34, 43

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................... 5

*Baden Sports, Inc. v. Molten USA, Inc.*, 556 F.3d 1300 (Fed. Cir. 2009) ...................................... 40

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d Cir. 2002) ........... 53

*BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596 (S.D.N.Y. 2010) ...................... 33, 35

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................... 5

*Best Van Lines, Inc. v. Walker*, 490 F.3d 239 (2d Cir. 2007) ................................................ 46, 53

*Cable v. Agence France Presse*, 728 F. Supp. 2d 977 (N.D. Ill. 2010) ........................................ 37

*Calder v. Jones*, 465 U.S. 783 (1983) ............................................................................................ 53

*Capitol Records, Inc. v. Naxos of America, Inc.*, 372 F.3d 471 (2d Cir. 2004) ........................... 10

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ...................................................... 6

*Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010) .............................. 47, 48

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158 (2d Cir. 2006) ..................... 11

*Cline v. 1-888-Plumbing Group, Inc.*, 146 F. Supp. 2d 351 (S.D.N.Y. 2001) ............................. 11

*Conn. Bar Ass'n v. United States*, 620 F.3d 81 (2d Cir. 2010) ..................................................... 11

*Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) ........................................................................... 55

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) ............................... 36, 37

*Defined Space, Inc. v. Lakeshore East*, LLC, 797 F. Supp. 2d 896 (N.D. Ill. 2011) ................... 37

*Diggs v. Musicland Grp., Inc.*, No. 96 CIV. 9642 (JSR), 1997 WL 195479, at *1 (S.D.N.Y. Apr. 22, 1997) ............................................................................................................................... 49

*Direct Mktg. of Va., Inc. v. E. Mishan & Sons, Inc.*, 753 F. Supp. 100 (S.D.N.Y. 1990) ............. 8

*Galli v. Metz*, 973 F.2d 145 (2d Cir. 1992) .................................................................................. 15

*Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23 (2d Cir. 1988) ........................................... 15

*Getty Images (US), Inc. v. Virtual Clinics*, 2014 U.S. Dist. LEXIS 37611, *2 (W.D. Wash. 2014) ................................................................................................................................. 3, 25

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011) 52

*Hayuk v. Starbucks Corp.,* 157 F. Supp.3d 285 (S.D.N.Y. 2016) .................................................. 6

*Houbigant, Inc. v. ACE Mercantile,* 914 F.Supp. 964 (S.D.N.Y. 1995) ................................ 49, 54

*Hsin Ten Enterprise USA, Inc. v. Clark Enterprises*, 138 F.Supp.2d 449 (S.D.N.Y. 2000) ........ 48

*In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009) ........................... 34

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709 (S.D.N.Y. 1995) ........................................................................................................................................ 8

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ..................................................................... 48

*JA Apparel Corp. v. Abboud*, 568 F.3d 390 (2d Cir. 2009) ......................................................... 12

*Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008) ................................................................... 28

*Kass v. Kass*, 91 N.Y.2d 554 (1998) ........................................................................................... 12

*Keeton v. Hustler Magazine, Inc.*, 465 U.S 770 (1984) ............................................................... 53

*Lawyers' Fund for Client Protection of State of N.Y. v. Bank Leumi Trust Co.*, 94 N.Y.2d 398 (2000) ...................................................................................................................................... 15

*Leberman v. John Blair & Co.*, 880 F.2d 1555 (2d Cir. 1989) .................................................... 11

*Lexmark, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014) .. 40

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) .............. 52, 53

*Linzer v. EMI Blackwood Music, Inc.,* 904 F.Supp. 207, 214 (S.D.N.Y. 1995) .................... 49, 55

*Marya v. Warner/Chappell Music, Inc.*, 131 F. Supp.3d 975 (C.D. Cal. 2015) .......................... 21

*Melchizedek v. Holt*, 792 F. Supp.2d 1042 (D. Ariz. 2011) ........................................................ 20

*Nat'l Comics Publs., Inc. v. Fawcett Publs., Inc.*, 191 F.2d 594 (2d Cir. 1951) ........................... 9

*Norton v. Sam's Club*, 145 F.3d 114 (2d Cir. 1998) .................................................................... 11

*Oravec v. Sunny Isles Luxury Ventures LLC*, 469 F.Supp.2d 1148 (S.D. Fla. 2006), *aff'd,* 527 F.3d 1218 (11th Cir. 2008) .................................................................................................... 23

*PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997)......................................... 45

*Penguin Grp. (USA) Inc. v. American Buddha*, 609 F.3d 30 (2d Cir. 2010) ............................... 49

*People v. Chitty*, 243 N.Y.S.2d 453 (N.Y. Sup. Ct. 1963) ........................................... 15

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57 (2d Cir. 2010) ................. 6

*Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286 (S.D.N.Y. 2000) ........................... 10

*Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188 (11th Cir. 2001) ........................... 29

*Playboy Enters. Int'l v. Mediatakeout.com LLC,* 2016 U.S. Dist. LEXIS 29249, \*2 (S.D.N.Y. 2016) ...................................................................................... 32

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) ............................................................ 5

*Regions Hosp. v. Shalala*, 522 U.S. 448 (1998) ................................................ 12

*Retail Software Servs. Inc. v. Lashlee,* 854 F.2d 18 (2d Cir. 1988)............................... 47

*Ruotolo v. City of N.Y.*, 514 F.3d 184 (2d Cir. 2008) .......................................... 5

*Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037 (2d Cir. 1980)........................... 10

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091 (2d Cir.1993) . 14

*Schatt v. Curtis Management Group. Inc.*, 764 F. Supp. 902 (S.D.N.Y. 1991) ...................... 9, 11

*Scholastic, Inc. v. Harris*, 259 F.3d 73 (2d Cir. 2001)............................................ 14

*Skidmore v. Led Zeppelin, et al.*, 2016 WL 1442461, CV 15–3462 RGK (AGRx) (C.D. Cal., April 8, 2016)............................................................................. 22

*Small v. Lorrillard Tobacco Co.*, 94 N.Y.2d 43 (1999)............................................ 42

*Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221 (2d Cir. 2014) ...................... 52

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) .................................. 6

*Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004).................................. 46

*Sybersound v. UAV*, 517 F.3d 1137 (9th Cir. 2008) ............................................ 39

*United States v. Kozeny,* 541 F.3d 166 (2d Cir. 2008)............................................ 15

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012) .......................................... 13

*Viacom Int'l Inc. v. YouTube Inc.*, 676 F.3d 19 (2d Cir. 2012) ..................................................... 35

*Walden v. Fiore*, 134 S. Ct. 1115 (2014) ..................................................................................... 52

*Wyatt Technology Corp. v. Malvern Instruments Inc.*, 2009 WL 2365647, No. CV 07–08298
   DDP (MANx) (C.D. Cal., July 29, 2009), *aff'd*, 526 F. App'x 761 (9th Cir. 2013) ............... 23

## STATUTES

15 U.S.C. § 1125(a)(1)(B) ............................................................................................................ 38

17 U.S.C. § 401(a) ......................................................................................................................... 8

17 U.S.C. §§ 10, 19 *et seq.* (1909 Copyright Act) ........................................................................ 8

17 U.S.C. §§ 201, 302(a) ............................................................................................................... 8

47 U.S.C. § 230 et seq ................................................................................................................. 43

Pub. L. No. 100-568, 102 Stat. 2853 (1988) ................................................................................. 8

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY at 2, 1424 (10th Ed., 2014) ........................................................... 6, 10

H.R.  Rep. No. 94-1476 at 134 (1976) .......................................................................................... 9

N.Y. C.P.L.R. § 302(a) (McKinney 2016) .................................................................................... 47

NIMMER ON COPYRIGHT, Section 12A.08 ................................................................................... 33

The Sonny Bono Copyright Term Extension Act, Pub. L. 105-298, 112 Stat. 2827 (1998) .......... 9

## INTRODUCTION
## AND FACTUAL BACKGROUND

Plaintiffs Carol M. Highsmith ("Ms. Highsmith") and This is America!, Inc. (the "Foundation") (collectively, "Plaintiffs") respectfully submit this combined memorandum of law in opposition to Defendants' Motions to Dismiss.

Having not served Answers or asserted any affirmative defenses, the Defendants have moved to have all claims contained in the First Amended Complaint [Dkt. 31] (hereinafter, the "FAC") dismissed under FED. R. CIV. P. 12(b)(6).  Collectively, the Defendants argue that the Plaintiffs have failed to state even a single valid claim against any of them in the FAC.  The Defendants' arguments are largely premised on the fundamentally flawed notion that all legal rights to Ms. Highsmith's photographic archive at the Library of Congress were ceded to the "public domain" as a matter of indisputable fact and law.  Notably, however, while all Defendants' Motions to Dismiss argue that Ms. Highsmith's photos (each a "Highsmith Photo") are "in the public domain," none of the Defendants actually asserts the affirmative defense of abandonment of copyrights.  Nor did any of them acknowledge their burden to prove the defense by clear and convincing evidence, nor did any of them discuss all of the relevant facts pled in the FAC, which are taken as true for purposes of a Motion to Dismiss.

Rather, seeking to evade all judicial scrutiny of their conduct, the Defendants have selectively seized upon a single sentence contained in Exhibit I to the FAC [Dkt. 31-9], a document titled "Instrument of Gift" (hereinafter the "Instrument"), which declared that Ms. Highsmith "dedicate[d] to the public all rights, including copyrights throughout the world..." The Defendants self-servingly ignore the usage and distribution limitations contained ***within this very same document*** that weigh heavily against a finding of intentional relinquishment of all rights.  Simply put, when properly viewed in its totality, the Instrument militates strongly in

favor of viewing the professed "dedicate to the public" language as demonstrating Ms. Highsmith's intent to offer a broad, free public license to her images, more akin to a digital "Creative Commons" license, which did not exist in 1992 when the <u>Instrument</u> was signed, rather than as an intentional abandonment.

Defendants' Motions to Dismiss also ignore other relevant facts pleaded in the <u>FAC</u> and its attached exhibits, including three documents in which Ms. Highsmith later represented to third parties that she retained copyrights in these images after she signed the <u>Instrument</u>, and before this lawsuit was filed.   Thus, the <u>FAC</u> and its exhibits plausibly plead and indeed copiously detail how Ms. Highsmith in no way intended to abandon all rights in her images to the public domain.

Despite these well-pleaded facts and documents in the <u>FAC</u>, the Defendants insist that this Court effectively treat all 19,000 of Ms. Highsmith's photographs at issue as the legal equivalent of William Shakespeare's 17th century sonnets, freely available to be not only copied and manipulated, but also somehow profitably "licensed" by the Defendants in a commercial manner identical to how Defendants sell and enforce copyright licenses.   Indeed, Getty Images (US), Inc. ("Getty" or "Getty Images") and the Alamy Defendants are directly accused of knowingly doctoring over 19,000 of Ms. Highsmith's photographs of America, having removed and altered their copyright management information and having distributed false copyright management information, including prominently emblazoning their corporate logos "***GETTY IMAGES***" and "***ALAMY***" across each and every one of them, with the intent to facilitate, enable, conceal, or induce infringement.   *See, e.g.,* <u>FAC</u> at ¶¶ 122, 175, 197.   All Defendants are also accused of distributing false copyright management information by, *inter alia*, misrepresenting the terms and conditions for using Ms. Highsmith's photographs, by

fraudulently declaring that the public must buy copyright licenses *from the Defendants* in order to have the ability to use or display them.  *Id.* at ¶¶ 114-125.

Getty Images and Alamy both sold spurious "rights managed" copyright "licenses" for the Highsmith Photos on their websites, for example with Getty offering "Standard editorial rights" packages starting at $175.00 USD for a small size up to $575.00 USD for a large size, and with "Custom rights" also offered.  *See id*. at Ex. K [Dkt. 31-11].  When the link next to the "Rights managed" text was clicked, Getty Images' website explained the term as follows: "Rights-managed products are *licensed with restrictions on usage, such as limitations on size, placement, duration of use and geographic distribution.*  You will be asked to submit information concerning your intended use of the product, which will determine the *scope of usage rights granted*."  FAC at ¶ 86 (emphasis added).  Additionally, Getty has recovered a judgment for $300,000 as plaintiff in a copyright infringement lawsuit by arguing that its "rights managed" licenses offer exclusivity—something only a copyright license can do.  *See Getty Images (US), Inc. v. Virtual Clinics*, 2014 U.S. Dist. LEXIS 37611, *2 (W.D. Wash. 2014).

Getty Images also published a "Copyright FAQs" webpage on its own website while it was selling copyright licenses for the Highsmith Photos.  FAC at ¶ 87.  On this webpage, Getty Images specified that "*all the images we represent require an appropriate license for their use*" and that *"[c]ustomers are not permitted to use imagery for any purpose without agreeing to a license."*  *Id*. (emphasis added).  Moreover, Getty's rights-managed license agreement at the time stated that a breach of it would constitute "copyright infringement," which could only be the case if the license was a copyright license.  Alamy's license agreement said the same, and Alamy undeniably displayed Highsmith Photos on its website with the patently false notice, "Copyrights: © [Contributor] / Alamy Stock Photo."  *See, e.g.*, FAC at Ex. L.  Nowhere on their

respective websites did Getty Images or Alamy ever identify the Highsmith Photos as being available to the public to reproduce and display for free, through the Library of Congress.  *Id*. at ¶ 88.

Yet, Getty Images and Alamy now take the absurd position that they were never actually selling any "copyright licenses" for the Highsmith Photos, but rather were merely charging some type of unspecified convenience fees.  Defendants preposterously posit that they were always effectively free to knowingly doctor Ms. Highsmith's photographs to remove their embedded copyright management information; free to emblazon their corporate logos across each and every one of them; free to hold themselves out as having the legal right to sell commercial "rights managed licenses" on behalf of Ms. Highsmith; free to place arbitrary "restrictions" on their usage; and even free to threaten users of these images, demanding that money be paid to them for any past usage, all without owing Ms. Highsmith any explanation, much less compensation.  In doing so, Defendants ignore the applicable legal doctrine of abandonment, their heightened evidentiary burden, and clearly relevant pleadings and evidence to try to contend to this Court that the legal status of the Highsmith Photos is such that they are fair game.

Incredibly, while speciously arguing that these images are devoid of any form of legal protections, the Defendants do not – ***and simply cannot*** – credibly explain how the threat letters sent by Defendant License Compliance Services, Inc. ("LCS") could have lawfully demanded that compensation be paid to the Defendants for any use of these allegedly "public domain" photographs.  The Defendants also incorrectly premise all of their legal arguments seeking to dismiss the Plaintiffs' Lanham Act and state law claims on the idea that such claims are preempted by the Copyright Act.

Essentially, the Defendants are proposing to this Court that they be declared, at this early stage, to possess *carte blanche* to do pretty much anything they please with Ms. Highsmith's 19,000 photographs, in order to reap a healthy stream of profits for themselves. But the FAC, its documentary exhibits, and the public record credibly demonstrate that Ms. Highsmith intentionally reserved her legal rights to control how her images could be commercially exploited. Therefore, the Plaintiffs respectfully urge a total rejection of the Defendants' arguments and request that the Court allow each of the Digital Millennium Copyright Act ("DMCA"), Lanham Act, and related unfair competition claims to proceed through the ordinary course of discovery and trial.

## ARGUMENT

### I.      FOR PURPOSES OF THE DEFENDANTS' MOTIONS, ALL WELL-PLEADED FACTS IN THE FAC ARE ACCEPTED AS TRUE.

On a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "Determining whether a complaint states a plausible claim for relief will be a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 296 (S.D.N.Y. 2010). Although "a complaint attacked by a

Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010).

In ruling on a motion to dismiss, a "court may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal quotation and citation omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks and citations omitted).

Here, the <u>FAC</u> is extremely detailed, contains extensive factual allegations, incorporates multiple documentary exhibits and hyperlinks, and pleads a credible and compelling set of legal claims against each of the Defendants.

## II.   MS. HIGHSMITH DID NOT INTENTIONALLY ABANDON ALL OF HER RIGHTS TO CONTROL HER PHOTOGRAPHS BY "DEDICATING" RIGHTS IN THEM TO THE PUBLIC.

The term "public domain" has been used at various times by both parties and non-parties alike here, leading to ongoing confusion about its precise meaning.  In this context, the legal term of art "public domain" means: "the universe of inventions and creative works that are not protected by intellectual property rights and are therefore available for anyone to use without charge."  BLACK'S LAW DICTIONARY at 1424 (10th Ed., 2014); *see also Hayuk v. Starbucks Corp.,* 157 F. Supp.3d 285, 290 (S.D.N.Y. 2016) ("raw materials" such as colors, letters,

descriptive facts and "the catalogue of geometric forms" are also part of the "public domain," and not protectable).

For copyright purposes, a public domain work is a photograph or other creative work that is now completely devoid of any private, proprietary limitations whatsoever on its usage.   The parties agree that a public domain work can be freely used, displayed, modified, or reproduced by anyone without requiring any form of advance permission from anyone.[1]   However, a public domain work cannot be lawfully "licensed" by anyone, as there are no rights whatsoever to control how it is used, and even Defendants contend that a public domain work cannot be "infringed."[2]

There are only two ways that a copyrighted work covered by the Berne Convention Implementation Act (BCIA) modifications to the 1976 Copyright Act can fall into the public domain: (1) through expiration of copyright term (such as the status of Shakespeare's sonnets, which are now over four hundred years old); or (2) through intentional abandonment of all rights by the copyright owner, as clearly and convincingly evidenced by his or her overt acts.

In the discussion below, the Plaintiffs will address the policy behind the 1976 Copyright Act and Berne Convention modifications to it, the legal standard governing abandonment of

---

[1] Of course, anyone can publish copies of Shakespeare's sonnets in a new book binding, and sell those books for profit, but that publisher is not vested with any new copyrights in the underlying work.  And it should go without saying that selling a physical good, such as a book, is very different from selling a copyright license.

[2] Indeed, selling a "license" for a public domain work, or a work which the public otherwise possesses the right to use for free (such as the Highsmith Photos), would be akin to a private party standing at one end of the Brooklyn Bridge fraudulently selling "tickets" for the public to cross.  Threatening someone with "infringement" and demanding that they pay a "settlement" if they cannot prove that they have such a "license" would be like the private party having its agent stand at the other end of the Brooklyn Bridge and stop everyone who crosses to demand that they pay a "fine" if they cannot prove that they bought a "ticket" from the principal the other end of the bridge.

copyright, and the facts of this case in relation to other cases that have ruled on copyright abandonment and analogous issues.[3]

A. **The 1976 Copyright Act and BCIA Eliminated the Doctrine of Forfeiture, Leaving Expiration and Abandonment as the Only Doctrines Under Which a Work May Enter the Public Domain.**

Before Congress adopted the 1976 Copyright Act, publication of a work of authorship without affixing a proper copyright notice would automatically place that work in the public domain (with limited exceptions). *See* 17 U.S.C. §§ 10, 19 *et seq*. (1909 Copyright Act). In 1976, the Copyright Act was amended by Congress to allow a copyright owner to cure his omission of the copyright notice by taking subsequent reasonable efforts to affix notice and registration within five years. *See Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709, 720 (S.D.N.Y. 1995). The 1976 Act was, in turn, later amended by passage of the BCIA, which eliminated this copyright notice requirement completely. *See* Pub. L. No. 100-568, 102 Stat. 2853 (1988).

Thus, while the current copyright statute provides that "a notice of copyright . . . *may* be placed on publicly distributed copies," affixing such a notice is no longer mandatory for works first published after March 1, 1989. *See* 17 U.S.C. § 401(a) (emphasis added); *see also Direct Mktg. of Va., Inc. v. E. Mishan & Sons, Inc.,* 753 F. Supp. 100, 104 n.8 (S.D.N.Y. 1990). Therefore, under the current Berne-era Copyright Act regime, copyright "vests initially in the author or authors of the work" when the work is created and "endures for a term consisting of the life of the author and 70 years after the author's death." *See* 17 U.S.C. §§ 201, 302(a).

The placement of a work into the public domain in the pre-Berne-era by publication without proper copyright notice was generally referred to as a "forfeiture" of copyright, which is

---

[3] In their opening briefs, the Defendants have utterly failed to even describe their legal burden of proof, much less satisfy it as a matter of law.

a separate and distinct doctrine from the now-controlling legal doctrine of "abandonment." Abandonment occurs through the ***intentional*** relinquishment of known legal rights as evidenced by an overt act.  *See Nat'l Comics Publs., Inc. v. Fawcett Publs., Inc.*, 191 F.2d 594, 597 (2d Cir. 1951) (discussing the difference between abandonment and forfeiture); *Schatt v. Curtis Management Group. Inc.*, 764 F. Supp. 902, 907 (S.D.N.Y. 1991) (same).   Because the draconian risk of inadvertent forfeiture was eliminated for any works published after March 1, 1989, all the photographs at issue in this case were created and published after that date, and Ms. Highsmith is still alive, the only method by which the photographs at issue in this case could have been consigned to the public domain was through intentional abandonment by Ms. Highsmith herself, as clearly and convincingly demonstrated by her overt acts.

Generally, the public policy behind the 1976 Copyright Act was geared towards providing greater protection of copyright and allowing far fewer works to enter the public domain.  For example, the House Committee Report stated that a longer copyright term was instituted because "the only result" of a work falling into the public domain "is a commercial windfall to certain users at the author's expense."   H.R.  Rep. No. 94-1476 at 134 (1976). Additionally, the renewal system under the 1909 Act was discarded with passage of the 1976 Act because its "highly technical requirements" were often "the cause of inadvertent and unjust loss of copyright."  *Id*.  The BCIA also eliminated all technical requirements regarding notice, further limiting the ability of works to fall into the public domain.  The Sonny Bono Copyright Term Extension Act of 1998 further extended the copyright term to the life of the author plus 70 years. *See* The Sonny Bono Copyright Term Extension Act, Pub. L. 105-298, 112 Stat. 2827 (1998).

Accordingly, the arrow of public policy over time clearly points toward greater protection of copyright and fewer works entering the public domain.[4]

### B.  *The Current Legal Standard to Evaluate the Intentional Abandonment of Copyright Derives from the Common Law.*

Because there is currently no federal statutory framework for placing a copyrighted work in the public domain, other than by expiration of term, the common law must be consulted for the legal structure of the copyright abandonment doctrine.  "Abandonment" is defined as the "relinquishing of a right or interest with the intention of never reclaiming it."  BLACK'S LAW DICTIONARY at 2 (10th Ed., 2014).  Abandonment of copyright is an *affirmative defense* to a copyright claim that requires the defendant prove "(1) an intent by the copyright holder to surrender rights in the work; and (2) an overt act evidencing that intent."  *Capitol Records, Inc. v. Naxos of America, Inc.*, 372 F.3d 471, 483 (2d Cir. 2004).

Because continued ownership of copyright is the default rule, intentional abandonment of copyright is an affirmative defense that, "being a forfeiture of a property interest, should be strictly proved," and thus requires proof by the heightened clear and convincing evidentiary standard.  *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980); *see also Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 295 (S.D.N.Y. 2000) (stating that the "defense of abandonment must be proven by clear and convincing evidence").

Moreover, because the heart of any abandonment inquiry is the *subjective intent* of the copyright owner, "federal procedural law would normally render the issue of intent to abandon inappropriate for summary judgment," much less at the initial pleading stage.  *See Naxos*, 372 F.3d at 483 (citing *Cline v. 1-888-Plumbing Group, Inc.*, 146 F. Supp. 2d 351, 364 (S.D.N.Y.

---

[4] This is a public policy that the Defendants, whose business model is the licensing and enforcement of copyright, should presumably wholeheartedly welcome and accept.

2001)); *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989) (holding that summary judgment is "notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles"); *Schatt*, 764 F. Supp. at 907 (abandonment "turns on the state of mind of the copyright proprietor").

In their Motions to Dismiss, the Defendants never articulated this applicable legal standard and never expressly pleaded the affirmative defense of abandonment.  The Plaintiffs are forced to assume that the Defendants are advancing the position that, based solely on the contents of the <u>FAC</u>, its documentary exhibits, and the public record, Ms. Highsmith unequivocally intended to surrender all of her copyrights in every photograph that she placed in the Library Collection such that no legal claim can ever be properly asserted against anyone involving any of these works.  However, the Defendants' Motions to Dismiss do not actually make this argument, nor do they even cite the applicable law or legal standards, and they should be denied on this basis alone.[5]

Nevertheless, even though the Defendants have utterly failed in their opening papers to properly address their heavy legal burden of proving an affirmative defense (much less satisfy it), or to even cite the applicable case law, the Plaintiffs will demonstrate below that the <u>FAC</u> and its documentary exhibits, along with the public record, do ***not*** clearly and convincingly demonstrate as a matter of law that Ms. Highsmith intentionally abandoned her legal rights to

---

[5] The Defendants never raised any affirmative defenses to the claims that are alleged in the <u>FAC</u>. For this reason alone, all affirmative defenses to infringement (fair use, abandonment, estoppel, license, etc.) should be considered waived by the Defendants for purposes of evaluating their Motions to Dismiss.  *See*, *e.g.*, *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) (stating that "[i]ssues raised for the first time in a reply brief are generally deemed waived) (citing *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998)); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 169 (2d Cir. 2006).

control how and whether her photographs could be commercially exploited by the Defendants. Thus, Defendants' Motions to Dismiss should be denied.

C.   ***The <u>Instrument</u>, When Viewed as a Whole, Is Not Clear and Convincing Evidence of Intentional Copyright Abandonment, But Rather the Intent to Create the Equivalent of a "Creative Commons" or public license.***

The <u>FAC</u> explains that Ms. Highsmith chose the venerable Library of Congress to provide the public with access to her photographic archive without charging permission fees. <u>FAC</u> at ¶¶ 51-61.  The <u>Instrument</u> is the most direct evidence of Ms. Highsmith's intent at the time she began archiving photos at the Library, so the language used within it requires close examination.

The <u>Instrument</u> contains the following language on the first page: "I hereby dedicate to the public all rights, including copyrights throughout the world, that I possess in this collection." [Dkt. 31-9 at 2].  If selectively read in isolation, as Defendants have done, this sentence might appear to weigh in favor of finding an intentional surrender of all copyrights in the images placed in the Archive to the public domain.  However, there is other language within this very same document, ignored by Defendants, that weighs heavily against a finding of total intentional relinquishment of all copyrights, and strongly in favor of viewing the professed "dedication to the public" as offering a broad, free license to the contents of the Archive, more akin to a digital "Creative Commons" license, which did not exist in 1992.

It is a fundamental canon of contractual and statutory interpretation that a court is to consider "[p]articular words" not in isolation "but in the light of the obligation as a whole and the intention of the parties as manifested thereby," *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009), citing *Kass v. Kass,* 91 N.Y.2d 554, 566 (1998); *see also Regions Hosp. v. Shalala,* 522 U.S. 448, 466 (1998) (Scalia, J., dissenting) ("the words of a statute are *not* to be

read in isolation; statutory interpretation is a holistic endeavor."); *United States v. Robinson*, 702 F.3d 22, 31 (2d Cir. 2012).

The full context of the Instrument gives a far clearer picture of Ms. Highsmith's intent in signing it.  For example, also on the first page the Instrument, a section titled "Reproduction" states, "Persons granted access to the Archive may procure ***single-copy reproductions of the works contained in the archive***…" FAC at Ex. I [Dkt. 31-9 at 2] (emphasis added).  This clear quantitative limitation and restriction on the manner of distribution is unquestionably an exercise of Ms. Highsmith's exclusive rights under the copyright laws of the United States to control how her photographs could be lawfully accessed and reproduced by persons granted access to the Library of Congress Archive.  If a user was granted access to the photographic Archive by the Library of Congress, but later exceeded the scope of Ms. Highsmith's license by, for example, making voluminous unauthorized copies and "licensing" them to others for profit, he would clearly be exceeding the scope of the free license that Ms. Highsmith intended to offer the public.

Indeed, 17 U.S.C. § 106, titled "Exclusive rights in copyrighted works," states as follows: "the owner of copyright under this title has the exclusive rights to do *and to authorize* any of the following: … (1) to reproduce the copyrighted work in copies or phonorecords; … (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;…" (emphasis added).

It is therefore thoroughly implausible, to say the least, that within the four corners of the Instrument itself, Ms. Highsmith would have intentionally relinquished and abandoned all her rights in the archived images to the public domain, but also insisted on putting limits and restrictions on their future use, distribution, or access thereto.  After all, on the same page of the Instrument as her alleged intentional abandonment, Ms. Highsmith exercised a legal right that

only she, as copyright owner, could possibly exercise, in limiting how the Library of Congress distributes and the public uses and accesses her images, prints, and negatives.  The copyright owner is the only party who may legally restrict the number of copies that can be made of an image, and Ms. Highsmith did precisely that within the Instrument.

Furthermore, the Instrument states that "video (analog) and/or optical disc (digital) copies may be made available to the public in general *in accordance with the Library's rules and regulations governing the availability of such copies.*"  FAC at Ex. I [Dkt. 31-9 at 2-3] (emphasis added).  This authorization is also unquestionably an exercise of Ms. Highsmith's exclusive copyrights, because she stated that the Library's rules and regulations govern and limit the availability and distribution of copies of her work – thereby incorporating by reference the Library's rules and regulations into the terms of her license.

One of the Library's rules and regulations is that it "does not license or charge permission fees for use of" material in its collections.  FAC at Ex. J [Dkt. 31-10] at 3.  Thus, it is entirely reasonable to infer that Ms. Highsmith's subjective intent when signing the Instrument was to authorize the Library of Congress to make access to her archived photographs broadly available to the public on terms that do not involve the charging of any commercial permission fees.

If the Instrument evidenced an intentional abandonment of all rights, these clauses regarding allowing single-copy reproductions and not charging permission fees would be superfluous nullities.  Courts disfavor interpretations that render express provisions contained in a document superfluous.  *See, e.g., Scholastic, Inc. v. Harris,* 259 F.3d 73, 83 (2d Cir. 2001) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094–95 (2d Cir.1993)) ("…[A] court must look at the entire integrated agreement, to safeguard against adopting an interpretation that would render any individual provision superfluous.")

(internal quotations omitted); *Galli v. Metz,* 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir. 1988)) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'"); *Lawyers' Fund for Client Protection of State of N.Y. v. Bank Leumi Trust Co.,* 94 N.Y.2d 398, 404 (2000) ("Bank Leumi's interpretation would render the second paragraph superfluous, a view unsupportable under standard principles of contract interpretation."); *see also United States v. Kozeny,* 541 F.3d 166, 174 (2d Cir. 2008) ("When interpreting a statute, we are required to give effect, if possible, to every clause and word of a statute,...and to avoid statutory interpretations that render provisions superfluous,…") (citations and internal quotations omitted).

Finally, the Instrument states as follows: "The Library will request, through its standard procedures, that when material in the Archive is reproduced by those who have obtained reproductions credit be given as follows: The Library of Congress, Carol M. Highsmith Archive." FAC at Ex. I [Dkt. 31-9 at 3]. This additional express requirement that the Library request attribution to Ms. Highsmith and the Library of Congress is further evidence of lack of intent on the part of Ms. Highsmith to wholly discard all her legal rights to control how her images are distributed, used, and displayed. *Cf. People v. Chitty*, 243 N.Y.S.2d 453, 455 (N.Y. Sup. Ct. 1963) (citing *Abel v. United States*, 362 U.S. 217, 241 (1960)) (intent to abandon is "clear and obvious" when property is left behind in a wastebasket when leaving a hotel). If the Instrument clearly evidenced a total, intentional abandonment akin to Ms. Highsmith throwing all her copyrights to her images in the proverbial wastebasket at a hotel, then why would she have expressly included any concerns, limitations, or restrictions on the manner or scope of the Archive's future use?

But the Defendants did not give even a cursory analysis of the entire Instrument in their Motions to Dismiss before summarily concluding the Highsmith Photos "unquestionably" are "in the public domain."  Instead, they deliberately seized upon a single sentence about "dedication to the public," taken out of context to support their self-serving interpretation, while completely ignoring everything else contained in the very same document.   When the entire contents of the entire Instrument are read together, it is more than reasonable to infer that the "dedicate to the public" language was intended by Ms. Highsmith to express her intention to grant a very generous and broad license to the public to reproduce and display her images for free, but still subject to limitations, several of which are detailed later in the same document.

### D.   *Conflicting Language on the Library of Congress Website Is Not Clear and Convincing Evidence of An Intent to Abandon by Ms. Highsmith.*

In their Motions to Dismiss, the Defendants also rely upon the fact that the Library of Congress has stated on its website that Ms. Highsmith's photographs are "in the public domain." [Dkts. 53-19, 53-20]  However, Ms. Highsmith does not and cannot control the language that is displayed on a federal government website.[6]  The Instrument, her own testimony, and the other contemporaneous documentary evidence discussed below are the most direct evidence of Ms. Highsmith's subjective intent with respect to her photography collection deposited in the Archive at the Library of Congress, and the same should be given far more weight than anything that the Library has ever said on its website.

Moreover, the statements on the Library's website are not as cut and dried as Defendants would have this Court believe, as the website also contains internal inconsistencies and gives conflicting advice.  For example, on the very same page that the Library incorrectly states that

---

[6] Ms. Highsmith intends to request that the Library clarify this particular statement to accurately reflect the broad license that she has granted to the public to use her images.

Ms. Highsmith's work is in the "public domain," the Library also says: "The Prints & Photographs Division and the U.S. Copyright Office, both based at the Library of Congress, are precluded from offering interpretations of the copyright law." Dkt. 53-20 at p. 10.

The Library also warns users that: "**[i]n all cases, it is the researcher's obligation to determine and satisfy copyright or other use restrictions when publishing or otherwise distributing materials found in the Library's collections.**" *Id.* at 2. (emphasis in original). This statement is made in response to the first question on the page: "Can I use an image that I've found in the P&P collections?". *Id.* Later on the same webpage, shortly after listing Ms. Highsmith's photographs as being in the "public domain," the Library website also reiterates its warning: "**(Reminder: in *all* cases, it is the researcher's obligation to determine and satisfy copyright or other use restrictions when publishing or otherwise distributing materials found in the Library's collections.)**" *Id.* at 6. (emphasis in original).

Toward the end of the same webpage, the Library's website addresses the following statement: "This all seems complicated when all I need is for you to sign a form giving me permission!" *Id.* at 12. In response, the Library states that the "Prints & Photographs Division cannot sign permission forms because, with one exception (the only exception is the Seagram County Court House Archives), it does not grant or deny permission to publish or otherwise distribute material from its collections," and "[s]ince the Library does not require that you receive its permission before using an image, the only permission you need is what may be required from the copyright owner or donor, independently of the Library." *Id.* The concluding paragraph in this section of the Library website states as follows:

> It can, indeed, be complicated to figure out whether an image can be used. One problem is that the copyright law traditionally was written for books and is increasingly written for music and film, profitable media for the entertainment industry. The law has to be "interpreted" to determine application to photographs and prints, and that's not always so clear, as there is little case law regarding images to draw on for precedents. *Id.*

Because the Library admits it is precluded from interpreting copyright laws, and the Library also admits interpretation of those laws is necessary to determine their application to photographs, the only logical conclusion is that no one could reasonably or justifiably rely on the Library's website statements about the copyright status of the Highsmith Photos. The Library thus gives its users what is, at best, a set of general guidelines, and not clear and convincing legal advice or binding representations. Its statements are in no way controlling or binding on any legal rights dispute that is presented, or binding on any particular rights holder, who cannot control precisely what is said there. Therefore, the single sentence on the Library's website on which Defendants rely falls far short of satisfying Defendants' burden to prove by clear and convincing evidence that Ms. Highsmith unequivocally and intentionally surrendered her copyrights to the public domain as a matter of law.

E.   **The _FAC_ Includes Additional Evidence of Ms. Highsmith's Intent to Have Reserved Her Rights.**

There is still more evidence attached to the FAC, and ignored by Defendants, that is probative of Ms. Highsmith's intent to have retained legal ownership of the copyrights in her images. As alleged in the FAC, individuals, companies, and organizations routinely contact Ms. Highsmith to request her permission to use the Highsmith Photos in a commercial manner, including sophisticated businesses regularly dealing in copyright permissions and clearance. *See* FAC at ¶¶ 157-160. As will be seen below, it appears that the warnings contained on the Library of Congress website that, in all cases, it is the researcher's obligation to determine the rights

status of photographs in the Library collections, discussed *supra* at <u>Section II.D</u>., were not lost on these responsible third parties.

As detailed in the <u>FAC</u>, in 2013, Knight Takes King Productions, LLC, sought and obtained Ms. Highsmith's advance, express written permission to use two of her photographs that they had found in Ms. Highsmith's collection at the Library as background, non-featured wall dressing for a set for the series *House of Cards*. <u>FAC</u> at ¶ 158. In connection with that transaction, Ms. Highsmith signed the document attached as <u>Exhibit O</u> to the <u>FAC</u>. [Dkt. 31-15]. In that document, Ms. Highsmith agreed to the following language: "I hereby grant to you, your successors, assigns and licensees the right to photograph reproduce and use my artwork…" *Id*. She further agreed: "***I represent that I am the owner and/or authorized representative of the artwork, and that I have the authority to grant you the permission and rights herein granted, and that no one else's permission is required with respect to the rights herein granted.***" *Id*. (emphasis added).

In June 2016, Ms. Highsmith also signed the agreement attached to the <u>FAC</u> as <u>Exhibit P</u> [Dkt. 31-16]. This agreement "granted permission to Warner Bros. Pictures, a division of WB Studio Enterprises Inc. ("WBP"), on behalf of Dena Films, Ltd. ("DFL") to use your attached ***Library of Congress football photographs*** (#2015634008, 2015634009, 2015634011, 2010638297) (the "Prop") as background set dressing in, and in connection with our feature motion picture (the "Motion Picture")…" *Id*. (emphasis added). The agreement further states, of Ms. Highsmith, "***You represent and warrant that you are the owner, or the authorized representative of the owner, of the rights herein granted,*** the person signing below is authorized to execute this letter of consent on your behalf, and that no third party permissions are required…" *Id*. (emphasis added).

Nearly a decade ago, Ms. Highsmith also signed a Clearance Agreement with Universal Network Television, that granted "full and complete right in perpetuity and through the universe to use [Ms. Highsmith's Fulton Steamboat Photos] in and in connection with the Producer's television production tentatively titled "The Office" (the "Production")" for 2007.  FAC at Ex. Q [Dkt. 31-17].   This Clearance Agreement further stated that Ms. Highsmith "***warrants and represents that it is the sole owner or holder (or the authorized representative of the sole owner or holder) of the rights granted herein, including, but not limited to any and all copyrights*** and trademarks…"  *Id*.  (emphasis added).

These are three compelling, written agreements attached to the FAC that Ms. Highsmith has signed since she began archiving her photographs at the Library of Congress, and before this lawsuit was filed, that show her consistent intent to retain her copyrights.   The written representations Ms. Highsmith made in these three agreements, in addition to the other evidence discussed above, create a triable issue of fact regarding whether her overt conduct, taken as a whole, constitutes clear and convincing evidence that she intended to abandon her copyrights.

### F.     *Case Law On Abandonment Does Not Support a Finding of Intentional Abandonment Here.*

Although intentional abandonment is a rarely-invoked affirmative defense in copyright cases, there are several published district court decisions on the issue that are illuminating in the present context.   These cases almost uniformly consider the affirmative defense of copyright abandonment in the context of disputed dispositive motions, with some courts granting such motions, and others declining to do so.

One court that did not grant summary judgment on the contested issue of abandonment is the district court in *Melchizedek v. Holt*, 792 F. Supp.2d 1042 (D. Ariz. 2011).  In that case, the

plaintiff, a copyright owner of meditation videos, had written an open letter to his followers that stated as follows:

> [P]ersonally I have never cared about the copyrights.  I wanted the information to go out to the world. … People have taken everything I have done in my life and even put it in their own books and sold it without giving me any compensation whatsoever.  But I have not tried to stop them.  *Id.* at 1052.

A few years later, Melchizedek said to a different group of people in Germany: "I don't care about copyrights or any of that stuff, that doesn't matter.  ***Forget it, just take it*** …"  *Id.* at 1053 (emphasis added).  Melchizedek did not dispute that he had declared so, but later contended that his statements in Germany were not intended about the particular copyrighted videos at issue in the lawsuit.  In the face of this conflicting evidence and the ambiguities in the record, the court found "the interpretation and intent behind Plaintiff's statements … is an issue of fact that could reasonably be resolved in favor of either party."  *Id.*  Further, the court found that "even if [Plaintiff] was referring to the Copyrighted Works, it is a disputed question of fact as to whether Plaintiff's intent was to abandon his copyright protection in these works."  *Id.*

Another district court in *Marya v. Warner/Chappell Music, Inc.*, 131 F. Supp.3d 975 (C.D. Cal. 2015) recently declined to find copyright abandonment of the "HAPPY BIRTHDAY" song when considering a motion for a directed verdict.  There, Marya was mentioned in a *Time* magazine article as having "no complaint to make on the use of the words [to Happy Birthday] because she long ago resigned herself to the fact that her ditty ***had become common property of the nation***."  *Id.*  at 992-93 (emphasis added).  In addressing whether this language constituted clear evidence of intentional abandonment of copyright, the court held that "[a] public statement like this, if believed, is an overt act on which a reasonable fact finder could base a finding that Patty abandoned her copyright interest in the lyrics.  However, we cannot say that this evidence is sufficient [for] a directed verdict at trial inasmuch as it is not a direct quote from [the copyright

holder]." *Id.* Similarly, in the instant case, the statement regarding Ms. Highsmith's work being in the "public domain" on the Library website is not a direct quote from Ms. Highsmith.

In another recent and high-profile copyright case, also from the Central District of California, the dispute involved copyright infringement claims against Led Zeppelin for their famous song *Stairway to Heaven*. *See Skidmore v. Led Zeppelin, et al.*, 2016 WL 1442461, CV 15–3462 RGK (AGRx) (C.D. Cal., April 8, 2016). In that case, the affirmative defense of copyright abandonment was considered and denied at the summary judgment stage. *Id.* at *5-7. The creator of the musical composition on which the infringement allegations were based in that case had been quoted as saying that "Led Zeppelin members 'used to come up and sit in the front row of all [Spirit's] shows and became friends[,] and ***if they wanted to use [Taurus], that's fine.*"** *Id.* (emphasis added). Later in the interview, he reiterated "I'll let [Led Zeppelin] have the beginning of *Taurus* for their song without a lawsuit." *Id.*

After taking stock of the *Melchizedek* and *Marya* decisions (discussed *supra*), the district court in *Skidmore* noted that these two "cases stand for the larger proposition that a copyright holder's statement <u>must be viewed in context</u> to determine whether it manifests an intent to abandon rights." *Id.* (emphasis added). The district court further noted that the creator of the song had later said to several people that he was considering filing a lawsuit over the matter, thus conveying mixed messages. *Id.* Therefore, the district court found "a genuine issue of fact exists as to the abandonment defense" and denied summary judgment on that basis. *Id.* In the instant case, as discussed *supra*, well after the <u>Instrument</u> was signed in 1992, Ms. Highsmith also signed several agreements with third parties granting them rights to commercially use her photographs, and representing that she was the owner of the rights so-granted, including expressly agreeing she owned copyrights in images found on the Library of Congress website.

Courts that have granted summary judgment on the abandonment defense have similarly addressed wide factual variations. In *Oravec v. Sunny Isles Luxury Ventures LLC*, 469 F.Supp.2d 1148, 1177-1178 (S.D. Fla. 2006), *aff'd,* 527 F.3d 1218 (11th Cir. 2008), part of Oravec's 2002 submission of his work to the Lower Manhattan Development Corporation ("LMDC") for architectural plans for the new Freedom Tower, the application process required applicants like Oravec to acknowledge that they maintained no copyright protections in the work they were submitting for the World Trade Center competition. Thus, Oravec signed a letter to the LMDC stating that he "reserve[d] no patent, trademark, copyright, trade secret, or other intellectual property rights in any of the material that forms or is contained in [his] proposal." *Id*. From this statement, the defendants argued that Oravec clearly abandoned or waived any interests in all of his design work relevant to the case. *Id*. at 1177–78. Such clear language evoking an intelligent, considered decision to waive and expressly abandon all intellectual property rights in a letter is obviously not the case here.[7]

In *Wyatt Technology Corp. v. Malvern Instruments Inc.*, 2009 WL 2365647, No. CV 07–08298 DDP (MANx) (C.D. Cal., July 29, 2009), *aff'd*, 526 F. App'x 761 (9th Cir. 2013), the district court had found an intentional copyright abandonment existed when the work itself contained the following statement by the creator: "Currently, there are no restrictions on this material. You may install it on as many PC systems as you like, and you may distribute it freely to your colleagues." *Id*. at *11. The district court also found:

---

[7] The FAC also notes that Ms. Highsmith was not represented by counsel when signing the Instrument in 1992. FAC at ¶ 55.

There is **_no evidence_** or argument before the Court that would create a genuine issue of material fact to the contrary.  For example, Plaintiff does not suggest that other language in the notice would mitigate any abandonment argument.  For instance, Plaintiff does not argue that the use of the term 'currently' or the examples provided by the notice limited the blanket 'no restrictions' language.  *Id.* at *11-12 (emphasis added).

The instant case can be readily distinguished from *Wyatt* because the Instrument **did** place restrictions on how many copies could be made and under what terms the works could be offered to the public, which militates against a finding of total, intentional abandonment.

This memorandum of law is not intended to be an exhaustive summary of the case law on copyright abandonment.  However, this representative sample of recent district court cases demonstrates that the affirmative defense of copyright abandonment is extremely fact-specific and contextual.  As such, and because there are many facts and documents in the FAC that weigh heavily against a finding of intentional copyright abandonment here, this issue is not proper for resolution on the Defendants' Motions to Dismiss.

## G. *The Defendants' Current Position Regarding the Copyright Status of the Highsmith Photos Lacks Credibility.*

The Defendants' implied but unasserted affirmative defense of copyright abandonment rings hollow in this case, given the factual allegations against the Defendants contained in the FAC itself.  Specifically, before this lawsuit was filed, all of the Defendants had publicly taken the position that the Highsmith Photos available at the Library of Congress were works protected by copyrights that they were asserting and/or licensing for profit.  The Defendants cannot credibly dispute this allegation, because the documentary evidence on the issue is overwhelming.

For example, the FAC attaches the threat letter directed at the Foundation, alleging that use of the Highsmith Photos required a copyright license from Alamy.  FAC at Ex. A [Dkt. 31-1].  For further example, as detailed in the FAC, Getty was offering "licenses" to the Highsmith

Photos under a "rights managed" licensing model.  FAC at ¶ 86.  The licensing agreement that Getty used for rights managed images before the FAC was filed in August 2016 contained the following term: "Any use of Licensed Material in a manner not expressly authorized by this Agreement ***constitutes copyright infringement***, entitling Getty Images to exercise all rights and remedies available to it ***under copyright laws*** around the world." *Gourley Declaration*, Ex. A at 5. (emphasis added).[8]   Therefore, anyone paying Getty for a "rights managed" license to a Highsmith Photo faced the specter of being accused of copyright infringement if the photograph was used in a manner not expressly authorized by the agreement.  This could not be the case if Getty's "rights managed" license agreement was not a purported copyright license, which it clearly was.

The fact that Getty's "rights managed" licensing structure necessarily involves licensing copyrights is further proven by public statements that Getty made in another lawsuit, where it was the plaintiff alleging copyright infringement.  In *Getty Images (US), Inc. v. Virtual Clinics*, the court found based on Getty's evidence and arguments that "Getty customers who license rights-managed images have exclusive use and control of those images.  Rights-managed images are often used by companies for major advertising campaigns, and customers pay a higher premium for the exclusivity associated with this model."  *Virtual Clinics*, 2014 U.S. Dist. LEXIS 37611 at *2.  The court further noted:

---

[8] At some point after the FAC was filed in August 2016, the "rights managed" image licensing agreement used by Getty apparently underwent a major overhaul, and no longer includes this term.  The licensing agreement in place when the Original Complaint was filed is referenced in paragraph 177 of the FAC by a hyperlink that is no longer active.  As such, a copy of the licensing agreement that was previously available at the hyperlink in the FAC is attached hereto as Exhibit A to the Declaration of James R. Gourley Esq. (the "*Gourley Declaration*"), and incorporated herein by reference.

> Getty contends that rights-managed images, like the two at issue here, are particularly subject to adverse commercial consequences when they are infringed because the images lose their exclusivity.  It is therefore possible that Getty lost additional revenue from customers who might have licensed these images or other rights-managed images, but did not do so because Getty could not guarantee the images' exclusivity. Therefore, although the lost revenue and profits gained in this case seem to be relatively modest, the broader impact of the [defendants'] infringement on Getty's revenue generation supports a heightened statutory damages award.  *Id*. at *8-9.

It would be impossible for Getty to have "guarantee[d] exclusivity" for a "public domain" photograph.  The only way to guarantee exclusivity is through valid copyright ownership and a license.  To be clear, Getty Images, as the plaintiff in a copyright infringement case, has obtained a $300,000 judgment – the maximum statutory damages available in the case – precisely by successfully arguing that its "rights managed" model was based on exclusivity, which necessarily implicates copyrights and cannot possibly be a part of any public domain photograph "license."  Getty is therefore precluded from arguing to the contrary here, and there is no credibility whatsoever in its absurd contention that the "rights managed" licenses that it was offering for Highsmith Photos for hundreds of dollars each were not actually copyright licenses at all, but merely some kind of convenience fee charged for making these allegedly "public domain" images available on its website.

The Alamy License Agreement ("ALA")[9] also contains very similar terms, and repeats them several times.  For example, the ALA states as follows: "Use of an Image/Footage in a manner not specifically authorised under the terms set out in the Invoice or otherwise in the Agreement constitutes a breach of the Agreement ***and an infringement of copyright***." *Gourley Declaration*, Ex. B at 6. (Section 9 – License Fee) (emphasis added).  The ALA further states: "In the event of termination, all rights granted will immediately revert to us and any further

---

[9] The Alamy License Agreement is attached to the *Gourley Declaration* as <u>Exhibit B</u>.

exploitation of any Image/Footage ***shall constitute an infringement of copyright***." *Id*. (Section

15.1) (emphasis added).  Additionally, the ALA states:

> Any use of the Image(s)/Footage in a manner not expressly authorised by this
> Agreement ***constitutes copyright infringement***, entitling Alamy to exercise all
> rights and remedies ***available to it under copyright laws*** around the world. You
> shall be responsible for any ***damages resulting from any such copyright
> infringement***, including any Claims by a third party. In addition and without
> prejudice to Alamy's other remedies under this Agreement, Alamy reserves the
> right to charge and you agree to pay a fee equal to up to fifteen (15) times Alamy's
> standard License fee for the unauthorised use of the Image(s)/Footage. *Id*. at 7
> (emphasis added).

Most importantly with respect to Alamy, on the same pages where Ms. Highsmith's

photographs were displayed on the Alamy website, Alamy flatly stated: "***Copyright: ©***

***[contributor]/Alamy Stock Photo***."   *See, e.g.*, FAC at Ex. L (emphasis added).   Alamy's

licensees and customers were thus clearly led to believe that they were purchasing a copyright

license for a copyrighted work, and that any use of a Highsmith Photo outside of the terms of the

agreement would be copyright infringement.  As with Getty, it appears inconceivable that this

agreement is not a purported copyright license.

Finally, LCS has sent out at least two letters (both attached as exhibits to the FAC)

stating that Highsmith Photos were protected by the copyright laws of the United States.  The

letter sent to the Foundation clearly states that "this infringement may have been unintentional"

and that "***the copyright law*** entitles Alamy to seek compensation for any license infringement."

*Id*. (emphasis added).  This is therefore evidence in the FAC that LCS has publicly taken the

position that the Highsmith Photos are protected by the copyright laws of the United States.

Of course, in their pending Motions to Dismiss, the Defendants now assert the self-

serving and contradictory position that Ms. Highsmith's photographs were utterly discarded into

the public domain and therefore are no longer protected by any form of copyright restrictions, at

all.  They also variously accuse Ms. Highsmith of making a "self-serving and conclusory

assertion" that her photographs were not placed into the public domain.  While this assertion as to Ms. Highsmith is false, the exact same charge can be credibly leveled at the Defendants.  They are each on written record taking the position prior to the filing of this lawsuit that the Highsmith Photos they were licensing were copyright-protected works.  Only now, after they have been accused of serious wrongdoing, have the Defendants chosen to advance the exact opposite position, using conclusory and self-serving assertions while ignoring controlling law.

**H.**      ***The Few Off-Point Cases Cited by the Defendants Do Not Support a Finding of Abandonment.***

Alamy's joint brief is the only one of the Defendants' three briefs that has cited any case law on the public domain issue.  However, each and every one of the cases cited by Alamy addressed copyright ***forfeiture*** under the pre-1976-Copyright-Act, pre-Berne-era regime.  *Alamy Brief* [Dkt. 55] at 8.  Those cases are wholly off point.  Again, at that time, as discussed *supra*, publication of a work without a proper copyright notice forfeited that work into the public domain.  Draconian forfeiture of copyright in this manner has been eliminated from the statute, and the public policy since then has shown a clear trend in favor of providing greater protection of copyright and allowing fewer works to enter the public domain.

**I.**      ***The FAC Demonstrates that Ms. Highsmith Intended to Provide an "Open Source" or "Creative Commons" License for Her Photographs.***

When viewed in totality, the pleadings and evidence included in the FAC demonstrate that Ms. Highsmith's intent was never to wholly abandon her copyrights, but rather to provide what is currently known as an "open source" or "Creative Commons" license for the public to reproduce and display her works for free.

In *Jacobsen v. Katzer*, 535 F.3d 1373, 1375 (Fed. Cir. 2008), the Federal Circuit considered, under Ninth Circuit law, "the ability of a copyright holder to dedicate certain work to

free public use and yet enforce an 'open source' copyright license to control the future distribution and modification of that work." *Id*. The Federal Circuit first noted that "[p]ublic licenses, often referred to as 'open source' licenses, are used by artists, authors, educators, software developers, and scientists who wish to create collaborative projects and to ***dedicate certain works to the public***." *Id*. at 1378 (emphasis added). Notably, this "dedicate to the public" language used by the Federal Circuit to describe a public or open source license mirrors the language cited by the Defendants in the 1992 <u>Instrument</u>, further confirming that the use of such language in the <u>Instrument</u> is not clear and convincing evidence that Ms. Highsmith intended to abandon all rights.

The Federal Circuit then provided the following justification for the enforcement of open source licenses:

> Traditionally, copyright owners sold their copyrighted material in exchange for money. The lack of money changing hands in open source licensing should not be presumed to mean that there is no economic consideration, however. There are substantial benefits, including economic benefits, to the creation and distribution of copyrighted works under public licenses that range far beyond traditional license royalties. *Id*. at 1379.

For example, the rights holder "may increase its national or international reputation by incubating open source projects." *Id*. The Federal Circuit in *Jacobsen* also noted that the "Eleventh Circuit has recognized the economic motives inherent in public licenses, even where profit is not immediate. *See id*. (citing *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1200 (11th Cir. 2001)).

In the instant case, the <u>Instrument</u> clearly restricts the number of copies that can be made by members of the public and states that distribution of copies is governed by the Library's rules and regulations that govern making such copies available in a non-commercial manner. As noted *supra*, one of the Library's rules and regulations is that the works be distributed without

charging permission fees.   Thus, a reasonable fact finder could easily conclude that Ms. Highsmith's intent when signing the <u>Instrument</u> was to create a broad and generous free public license, akin to the open source license approved of by the Federal Circuit in *Jacobsen*, whereby copies of works would be distributed to the public to use and display, for free, but are still not abandoned to be doctored, "licensed," and commercially exploited as the Defendants here have improperly done.

Thus, in conclusion, the Defendants have sought to have this Court dismiss the entirety of all claims in the <u>FAC</u> against them based on their implied assertion of an unpleaded affirmative defense that frankly lacks credibility.   The Defendants' Motions to Dismiss on that basis should be denied, and the case should continue to proceed through the ordinary course of discovery and trial.

## III.   THE DEFENDANTS PROPERLY STAND ACCUSED OF PROVIDING FALSE "COPYRIGHT MANAGEMENT INFORMATION" FOR AT LEAST 19,000 HIGHSMITH PHOTOGRAPHS.

Ms. Highsmith's claims against Getty, Alamy, and LCS under the DMCA in this case are straightforward.   The <u>FAC</u> expressly alleges that each of the Highsmith Photos available for download on the Library website contained copyright management information or "CMI."   That CMI, as defined in 17 U.S.C. § 1202(c)(1)-(3), (6), included: the title and other information identifying the work; the name of, and other identifying information about, the author of the work; the name of, and other identifying information about, the copyright owner of the work; and the terms and conditions for use of the work.   <u>FAC</u> at ¶ 166.

Indeed, the Library of Congress' website provides such information about each Highsmith Photo in the Archive that specifically includes: (a) Ms. Highsmith's title for the work; (b) an identification of "Carol M. Highsmith" as the author or creator of the work; (c) a proper

credit line to use with the work referencing the Library of Congress collection in which the work appears; (d) in some instances, a citation to the work in MLA, Chicago, and/or AP formats; (e) a link to the Highsmith collection main page, which provides information indicating Ms. Highsmith's intention that the public be given free access to her collection; (f) in many if not all instances, a rights advisory indicating "No known restrictions on publication," signifying Ms. Highsmith's intention that her images may be used by the public for free without purchasing a commercial license; and (g) in many if not all instances, one or more statements that, "Rights assessment is your responsibility," and/or a statement that, "The Library of Congress generally does not own rights to material in its collections and, therefore, cannot grant or deny permission to publish or otherwise distribute the material." *Id*. at ¶ 167, Ex. J.

It is specifically alleged in the <u>FAC</u> based on well-pleaded facts that, in violation of the DMCA, 17 U.S.C. § 1202(a), all Defendants, knowingly and with the intent to induce, enable, facilitate, or conceal infringement, provided or distributed CMI for the Highsmith Photos that was demonstrably false.  Namely, and by their own arguments, none of the Defendants has or ever had any form of ownership interest or other connection in or to any of the Highsmith Photos, and thus they had no legal right to edit or doctor the photographs, much less to display their own corporate name on each of them and license their copyrights for profit.  *Id*. at ¶ 168.

Further, it is clearly alleged in the <u>FAC</u> based on well-pleaded facts that, in violation of 17 U.S.C. § 1202(b), all Defendants intentionally removed and/or altered CMI for each of the Highsmith Photos, or distributed CMI knowing it had been removed or altered without authority of the copyright owner or the law, knowing or having reasonable grounds to know that doing so would induce, enable, facilitate, or conceal an infringement of one of Ms. Highsmith's rights vested under Title 17 of the United States Code. *Id*. at ¶ 170.

For example, as shown in the photo taken from Defendant Getty's website in <u>Figure</u> 4 of the <u>FAC</u>, Getty provided a false watermark over the image falsely claiming that Getty has some kind of ownership interest in the photograph:



**<u>Fig. 4 of FAC</u>**

Alamy has also provided false watermarks on its copies of the Highsmith Photos.  The application of a false watermark to a photograph is "facially suggestive of ownership" and therefore qualifies as CMI.  *See Agence Fr. Presse v. Morel*, 934 F. Supp. 2d 547, 577 (S.D.N.Y. 2013).  Furthermore, this Court has held that, at the 12(b)(6) stage, to "the extent [the defendant] suggests a good-faith defense to the DMCA claim, or some other factual basis for excusing [its] application of its own watermark to the photos at issue, any such defense must await development of a factual record." *See Playboy Enters. Int'l v. Mediatakeout.com LLC,* 2016 U.S. Dist. LEXIS 29249, *2 (S.D.N.Y. 2016) (citing *BanxCorp v. Costco Wholesale Corp.*, 723 F.

Supp. 2d 596, 609 (S.D.N.Y. 2010) (denying motion to dismiss where plaintiff provided "an actual example of the allegedly infringing ad")).

The DMCA's provisions prohibiting such conduct were designed to protect the integrity and distribution of photographs in the online world. *See* NIMMER ON COPYRIGHT, Section 12A.08. Section 1202's provisions of the DMCA apply to Getty's and Alamy's conduct, as they are each alleged to have intentionally removed and/or altered CMI for each one of the Highsmith Photos, knowing or having reasonable grounds to know that doing so would induce, enable, facilitate, or conceal an infringement of one of Ms. Highsmith's rights vested under Title 17 of the United States Code to control how these photographs could be used.

Subsequently, it is alleged that Getty and Alamy offered copyright "licenses" and the Defendants collectively threatened users of these images, demanding money. *See* FAC, *passim*. Thus, the "infringement" that has been induced, enabled, facilitated, or concealed by Getty and Alamy under the DMCA is not a claim that these images would later be used or displayed by members of the public, since everyone already has Ms. Highsmith's permission to do that. Rather, the Defendants' intention was to commercially misappropriate, and thereby intentionally abuse and infringe upon, Ms. Highsmith's exclusive rights under 17 U.S.C. 106 to authorize (or, set the terms for) the reproduction and distribution of copies of her works, as well as her exclusive right under 17 U.S.C. 106(3) to "distribute copies … of the copyrighted work to the public by sale or other transfer of ownership." FAC at ¶ 181. That they continued to do this after Ms. Highsmith called Getty's and Alamy's agent LCS shows that they intentionally disregard the rights of others. Because Ms. Highsmith is clearly a "person injured" by all Defendants' violations of Section 1202 (including, *inter alia*, injury to her reputation), she is

explicitly qualified as a person who may bring a civil action for such violations under Section 1203.

In its separate brief, LCS alleges that it does not convey CMI in connection with copies of a work.  Obviously, LCS's position is belied by Exhibit M to the FAC, which is a letter that LCS sent to a third party in Pennsylvania alleging infringement of a Highsmith Photo.  On page 3 of Exhibit M attached to the FAC, one of Ms. Highsmith's photographs is clearly displayed as the "Original Image" in the LCS letter itself, which demands payment of copyright licensing fees.  The factual allegations in the FAC include the contentions that charging a commercial copyright "license" for Ms. Highsmith's photos is an act of providing false CMI, and representing Alamy as the copyright owner is another act of providing false CMI.  FAC at ¶ 212.  LCS has unquestionably done this.  There is no requirement that the false CMI be provided in connection with "commercially-usable photography," as LCS suggests in its brief.  *LCS Brief* [Dkt. 52] at p. 11.

With regards to the question of whether LCS and Alamy have intentionally altered or removed CMI, the Plaintiffs have no way of knowing the details surrounding receipt of the Highsmith Photos by Alamy and LCS.  Again, however, Plaintiffs have pleaded and provided evidence that the Defendants intentionally continued with their licensing and enforcement scheme after Ms. Highsmith called the telephone number on the letter she received and objected to their conduct.  Plaintiffs should not be required to allege any facts regarding the Defendants' intent that are impossible to know at this point in litigation before any discovery has been produced by the Defendants, for the claim to survive.  *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (courts should be "lenient in allowing scienter issues . . . to survive motions to dismiss"); *Morel*, 769 F. Supp. 2d at 306 (denying motion to

dismiss DMCA Section 1202(a) and 1202(b) claims when a photograph was attached to the complaint that did not credit the photographer); *BanxCorp*, 723 F. Supp. 2d at 609.

Additionally, in *Viacom Int'l Inc. v. YouTube Inc.*, 676 F.3d 19, (2d Cir. 2012), the Second Circuit has held, in the context of the DMCA safe harbor, that "the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA." *Id*. at 40.   The facts pleaded in the FAC, as described above, would also reasonably support a conclusion that the Defendants are willfully blind as to whether they actually possess the licenses they purport to be selling or enforcing.   For all of the foregoing reasons, the DMCA claims in this case should not be dismissed as a matter of law over a scienter issue.

## IV.   PLAINTIFFS' FALSE ADVERTISING CLAIMS ARE NOT PREEMPTED BY THE COPYRIGHT ACT.

The Plaintiffs have also asserted that the Defendants' conduct violates the Lanham Act and state laws by making unauthorized use of Ms. Carol M. Highsmith's commercially valuable name in connection with commercial efforts to charge money for purported copyright licenses to her photographs, and by the Defendants fraudulently holding themselves out as the agent(s) of Ms. Highsmith and the Foundation.   Thus, by doing so, the Defendants have used "false statement(s) of fact" and/or "misleading statement(s) of fact" that are likely to cause confusion, mistake, or deception as to the affiliation or connection of the Defendants with Ms. Highsmith and the Foundation, and as to the sponsorship, association, or approval of the Defendants' services with Ms. Highsmith and the Foundation, in clear violation of Section 43(a) of the Lanham Act.   15 U.S.C. § 1125(a)(1)(A).   For example, the FAC attaches numerous exhibits showing that third parties have purchased commercial licenses from Getty, reflecting "credit" to "Getty" alongside Ms. Highsmith. *See, e.g.,* FAC at Exs. C to F [Dkts. 31-3 to 31-6].

Nonetheless, each of the Defendants have taken the position that the Lanham Act claims in this case are wholly preempted by the Copyright Act under the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23 (2003), and its progeny, and thus should be dismissed as a matter of law.   However, as discussed below, each of the Defendants' accused acts can be distinguished from *Dastar* and its progeny in ways that give rise to valid Lanham Act claims.  In fact, the accused conduct of the Defendants falls squarely within an exception to its ruling that the *Dastar* Court said would unquestionably have survived. Therefore, Plaintiffs have asserted cognizable claims against all Defendants under Section 43(a)(1)(A) of the Lanham Act.

Additionally, each of the Defendants is accused of offering commercial copyright licenses to works that they now contend were wholly in the "public domain."  Thus, by their own argument, the Defendants apparently admit they were making literally false statements of fact about exactly what it was that they were offering for sale.  For this reason alone, their Motions to Dismiss the Lanham Act Section 43(a)(1)(B) false advertising claims lack credibility and should be dismissed.

### A.      *Defendants have Violated Section 43(a)(1)(A) of the Lanham Act.*

Getty has correctly identified the author in the title of each Highsmith Photo as follows: "Photo by: Carol M. Highsmith."   That fact is obviously not the gravamen of the dispute. However, Getty *__also__* displayed *__false__* co-credits, by giving itself a professed affiliation with Ms. Highsmith that is likely to cause confusion as to the existence of a commercial connection between Getty and Ms. Highsmith, when none such exists.

Furthermore, when Alamy and LCS send threatening letters, accusing the public of copyright infringement by using Ms. Highsmith's images, it is alleged that the recipients will

likely research the issue and learn about Ms. Highsmith's Archive at the Library.  FAC at ¶¶ 154-155.  Therefore, the recipients of LCS' letters will undoubtedly be very confused as to the apparent existence of a commercial affiliation between Ms. Highsmith, on the one hand, and LCS/Alamy, on the other, and blame Ms. Highsmith for the apparent hypocrisy of charging exorbitant fees for the same works she has already granted a free public license to display.  Such is the very core of the prohibition against this type of deceptive conduct, and is not preempted by the Copyright Act.

The conduct of Alamy/LCS and Getty in doctoring the photographs to add their own corporate names and logos to the Highsmith Photos also falls squarely within the exception to the *Dastar* preemption analysis for Lanham Act Section 43(a) claims.  The Supreme Court in *Dastar* held that the "claim alleging false designation of origin would undoubtedly be sustained if [the defendant] had bought the [works] and merely repackaged them as its own." *Dastar*, 539 U.S. at 31.  At least two district court cases have found that claims against defendants accused of passing off photographs as their own without revision or proper accreditation, as Defendants here stand accused of doing, were not preempted by the Copyright Act because they fell within the "repackaging" exception of *Dastar*.  *See Defined Space, Inc. v. Lakeshore East*, LLC, 797 F. Supp. 2d 896, 901 (N.D. Ill. 2011) (denying motion to dismiss because the plaintiff alleged that the defendants took the plaintiff's "photographs and passed them off as their own photographs without revision or proper accreditation."); *Cable v. Agence France Presse*, 728 F. Supp. 2d 977, 981 (N.D. Ill. 2010) (noting that "the *Dastar* court limited its ruling in one important way--it stated that a claim under Section 43(a) 'would undoubtedly be sustained if *Dastar* had bought some of New Line's Crusade videotapes and merely repackaged them as its own,'" and denying

the motion because the plaintiff alleged that the defendants "took the plaintiff's photos and repackaged them as their own without revision.")

In this case, the <u>FAC</u> alleges Defendants acquired Ms. Highsmith's photos from the Library archive (possibly through an intermediary), repackaged the photos as their own, and started selling copyright licenses. Such conduct falls squarely within the *Dastar* exception noted above. This Court should adopt the well-reasoned position of the courts in *Defined Space* and *Cable*, and deny Defendants' Motions to Dismiss.

### B. Defendants Also Separately Violated Section 43(a)(1)(B) of the Lanham Act.

Section 43(a)(1)(B) of the Lanham Act separately prohibits the use, in connection with any goods or services, of any "false or misleading description of fact, or false or misleading representation of fact, which … in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). As discussed in Section II.D., *supra*, the Defendants have purported to sell and/or enforce commercial copyright licenses for the Highsmith Photos at issue. Therefore, the good or service being sold by the Defendants was a copyright license, which purported to commercially "license" legal rights the Defendants (admittedly) never possessed and could never have legitimately offered for sale in commerce. The fact that such a commercial license cannot exist is a false or misleading fact or representation ***about the nature of the purported license itself***. Indeed, it is fundamental to the concept of a commercial license that the person granting it actually have something to sell.

If Ms. Highsmith's photographs were actually "in the public domain," as the Defendants contend (but which Plaintiffs dispute), it would be legally impossible for ***anyone*** to commercially "sell a copyright license" to use them or send enforcement letters concerning such

license.   This inquiry has nothing whatsoever to do with attribution of authorship to Ms. Highsmith.   The Defendants' briefs are replete with cases that hold that anyone can copy, use, sell, or alter a public domain work without getting permission from anyone else.   And that is true, but of no consequence here.   The crux of the issue is that Defendants' sale and enforcement of purported copyright licenses for what they now allege were "public domain" works was wholly illusory and deceptive, irrespective of whether the works were "in the public domain" or instead were still subject to copyrights but available for use by the public for free.   It is inconceivable that such a blatantly false statement or representation that has nothing to do with authorship would not be clearly actionable under the Lanham Act.

The Defendants cite *Sybersound v. UAV*, 517 F.3d 1137 (9th Cir. 2008), for the proposition that the licensing status of a work was not a "part of the nature, characteristics, or qualities of the karaoke product" at issue in that case.   *Id.* at 1144.   However, the Ninth Circuit also stated that the "nature, characteristics, and qualities of karaoke recordings under the Lanham Act are more properly construed to mean characteristics of the good itself, such as the original song and **_artist_** of the karaoke recording."   *Id.* (emphasis added).   Of course, the majority of courts have held that the original artist is not a nature, characteristic, or quality, because otherwise Section 43(a)(1)(B) would provide an end run around *Dastar*.   So, immediately, the reasoning behind *Sybersound* is suspect.

The *Sybersound* court went on to decline to construe the Lanham Act from covering the licensing status of a work because it "would allow competitors engaged in the distribution of copyrightable materials to litigate the underlying copyright infringement when they have no standing to do so because they are nonexclusive licensees or third party strangers under

copyright law." *Id.*  Respectfully, the Ninth Circuit panel in *Sybersound* was incorrect, and even if they were correct, that reasoning simply would not apply to the case at bar.[10]

## V.   PLAINTIFFS HAVE STANDING UNDER THE DMCA, LANHAM ACT, AND NEW YORK LAW.

In its separate brief, Defendant LCS also independently contends that the Plaintiffs lack standing to bring this action under the DMCA, Lanham Act, and New York law.  *LCS Brief* [Dkt. 52] at 17-19.  To the extent that LCS bases its lack of standing argument on the alleged public domain status of the Highsmith Photos (*LCS Brief* [Dkt. 52] at 18), LCS is incorrect for reasons described in Section II, *supra*.

LCS further alleges that the injury to Ms. Highsmith's reputation is speculative and not concrete enough to confer any standing to sue.  LCS cites no case law in support of this assertion.  However, a unanimous U.S. Supreme Court (*per* Scalia, J.) held that the § 1125(a) cause of action contained in the Lanham Act "extends to plaintiffs who fall within the zone of interests protected by that statute and whose injury was proximately caused by a violation of that statute."  *Lexmark, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1382, 188 L. Ed. 2d 392, 397 (2014).  The Supreme Court in *Lexmark* noted that the Lanham Act includes a detailed statement of its purposes, including, as relevant here, "protect[ing] persons engaged in

---

[10] *See also*, *Baden Sports, Inc. v. Molten USA, Inc.*, 556 F.3d 1300, 1308 (Fed. Cir. 2009) (involving a false advertising claim for use of the term "innovative" to describe a basketball). The term "innovative" was said to be deceptive by the plaintiff in that case because the defendant did not really innovate or invent the technology at issue.  *Id.*  The Federal Circuit held that this was really a false authorship claim in disguise, and held that the statement did not go to the nature, qualities, or characteristics of the basketball.  *Id.*  Here again, by stark contrast, the good being sold by Defendants is a copyright license, the existence or nonexistence of which can be determined without necessarily referencing the author.  The Federal Circuit Court of Appeals in *Baden* followed *Sybersound* because it was applying Ninth Circuit law. However, the court in *Baden* acknowledged that "under the law of a different circuit, this case may well have a different result." *Id.* at n1.

[commerce within the control of Congress] against unfair competition," 15 U. S. C. §1127; and "unfair competition" was understood at common law to be concerned with injuries to business reputation as well as present and future sales. Thus, to come within the zone of interests in a §1125(a) false-advertising suit, a plaintiff must allege an injury to a ***commercial interest in reputation*** or sales. *Id.*

As pleaded in the <u>FAC</u>, Ms. Highsmith's professional reputation as an accomplished and generous photographer is clearly damaged by the Defendants' unauthorized commercial actions alleged in the <u>FAC</u>. Moreover, Ms. Highsmith and the Foundation have a commercial (albeit not-for-profit) interest in Ms. Highsmith's reputation, as they attract money from wealthy donors and others based on their representations and donors' expectations that the public will have free access to the archived photographs that Ms. Highsmith creates and deposits. A clear and obvious tie thus exists between Ms. Highsmith's sterling professional reputation as a generous person, the false and misleading commercial misrepresentations made by the Defendants, and the serious consequence that Ms. Highsmith's fundraising activities, and the Foundation's, have been and will be jeopardized.

## VI.   PLAINTIFFS HAVE STATED A NEW YORK BUSINESS LAW CLAIM AND A NEW YORK COMMON LAW CLAIM.

All Defendants contend that Plaintiffs have failed to state a claim under New York Business Law or the common law. *Getty Brief* [Dkt 45] at 15-25; *Alamy Brief* [Dkt. 50] at 14-19; *LCS Brief* [Dkt. 52] at 14-17. To the extent that Defendants base their failure to state a claim argument on the alleged public domain status of the Highsmith Photos (Dkt. 52, p. 18), they are incorrect for reasons described in Section II, *supra*. Furthermore, as described above in Section V, *supra*, the Plaintiffs' reputational harms are concrete and particularized.

Defendants also allege that there is no specific and substantial injury to the public interest over and above ordinary trademark infringement. *LCS Brief* [Dkt. 52] at 15; *Getty Brief* [Dkt. 45] at 22; *Alamy Brief* [Dkt. 50] at 15. However, the public clearly has an interest in threat letters being sent out alleging copyright violations for using works that need no license from LCS's clients. This is not a situation of "consumers who buy a product that they would not have purchased" under *Small v. Lorrillard Tobacco Co.*, 94 N.Y.2d 43, 56 (1999), or paying more than they needed to under the cases cited on page 23 of Getty's brief. LCS is accused of, in essence, sending extortionate letters on behalf of Alamy and Getty, and threatening legal repercussions against people who have every right to use the photographs they are using. How this conduct could fail to implicate the public interest is inconceivable. Similarly, with Getty and Alamy, the public has a major interest in whether purported copyright licenses being sold are real or illusory, particularly when the seller is the self-professed global industry leader in the photography copyright licensing business.

Of course, LCS contends in its brief that, by filing this lawsuit, Plaintiffs "have already injured every user of the public domain through the chilling effect of potential lawsuits." *LCS Brief* [Dkt. 52] at 3. That this accusation is being made by a party who has already sent out letters to members of the public accusing them of copyright infringement and demanding settlement payments for alleged unlicensed use of what LCS now alleges are public domain photos makes it blindingly hypocritical. Every single member of the public who has paid the Defendants for an illusory copyright license already had the right to a free copy from the Library of Congress, per Ms. Highsmith's generous license.

Regarding the "bad faith" element of the common law claim, Plaintiffs have again pleaded sufficient facts that would support bad faith on the part of all Defendants. In particular,

the FAC explicitly alleges that the New York law firm Cuomo LLC has represented more than **_3,000_** individuals and other parties (including many non-profit organizations) who have received such letters from the Defendants.  FAC at ¶ 26.  The FAC further alleges that when Cuomo LLC wrote to Defendants asking for proof that they were authorized to act on behalf of the copyright owner, the Defendants simply never responded.  *Id*. ¶ 27.  The fact finder could easily determine that Defendants never really cared about whether they were enforcing valid copyrights when sending these letters, and therefore showed bad faith in their enforcement of copyright licenses that they admit never existed.

## VII.    ALAMY IS NOT IMMUNIZED BY THE COMMUNICATIONS DECENCY ACT OF 1996 BECAUSE IT IS AN "INFORMATION CONTENT PROVIDER."

In its separate brief, Defendant Alamy attempts to immunize itself from Plaintiffs' state law claims as an interactive computer service provider under the Communications Decency Act of 1996 ("CDA").  *See* 47 U.S.C. § 230 et seq.  Getty has not sought to avail itself of this defense, presumably because this Court has already rejected a very similar argument by Getty under the DMCA safe harbor provisions.  *See Morel*, 769 F. Supp. 2d at 568.

As Alamy has correctly noted on page 21 of its brief, this immunity applies only when the interactive computer service provider is not also an "information content provider," which is defined as a person or entity who is "responsible, in whole or in part, for the creation or development" of the accused content.  47 U.S.C. § 230 (f)(3).  In the FAC, Plaintiffs have clearly alleged that Alamy itself has intentionally provided false CMI and altered CMI, making Alamy a content provider under the CDA.

For example, the FAC squarely alleges that Alamy has intentionally provided false CMI and altered CMI by placing its watermark over the Highsmith Photos and displaying the Highsmith Photos with the statement: "Copyright: © [Contributor] / Alamy Stock Photo."

Although discovery will bear this out, it is extremely unlikely for Alamy's users to have placed the Alamy watermark over the Highsmith Photos and to have placed "Alamy Stock Photo" in the copyright notice.  As these are but two examples of false and altered CMI provided by Alamy, it is not immunized for this conduct under the CDA.

Regarding the Lanham Act and New York state law violations alleged in the FAC, Alamy is similarly the only party responsible for the false representations and misappropriations that underpin those violations.  After all, it is Alamy – and not Alamy's users – who is selling an illusory copyright license for Highsmith Photos.  It is Alamy – and not Alamy's users – who held itself out as Ms. Highsmith's commercial agent and who hired LCS to similarly hold itself out and send threatening letters to users of the Highsmith Photos.  Here again, Alamy is an information content provider under the CDA, and therefore is not immunized.

## VIII. LCS IS PROPERLY SUBJECT TO PERSONAL JURISDICTION IN NEW YORK.

In its separate brief, Defendant LCS also independently contends that this Court lacks personal jurisdiction over all of the claims asserted against it, and declares that it could not have reasonably anticipated being haled into New York to defend itself, demanding that all claims asserted against it should be dismissed in their entirety.  *LCS Brief* [Dkt. 52] at 20-21.  But it is clear that LCS is subject to this Court's personal jurisdiction for several independent reasons, and that LCS cannot evade this Court's scrutiny for its accused conduct here.

### A.      *LCS is Properly Accused of Acting as Getty's Alter Ego.*

The FAC alleges (and Getty has not denied) that "Defendant Getty Images (US), Inc., is a corporation organized and existing under the laws of New York, having its principal place of business at 605 Fifth Avenue South, Suite 400, Seattle, Washington 98104, ***and also having offices at 75 Varick Street, New York, New York 10013, and owns and/or is operated under***

**_common control with Defendant License Compliance Services, Inc…."_**    _FAC_  at  ¶ 36.

Defendant Getty Images is thus alleged to be a New York Corporation, is clearly subject to

personal jurisdiction in this Court, and has waived any potential defenses under Fed. R. Civ. P.

12(b)(2).   LCS is accused of acting as both Getty's and Alamy's authorized agent, as well as

Defendant Getty's alter ego, thus tying LCS to New York.  _See_ _FAC_ at ¶¶ 107-149.

As discussed _infra_, the _FAC_ also details the many reasons for treating LCS as Getty's

alter ego.  _See also_ _FAC_ at ¶¶ 143-149.  LCS is a "wholly owned subsidiary" of Getty Images,

Inc., that is accused of collaborating with Alamy to send baseless threat letters sent to consumers

and members of the public, located in this Judicial District, on behalf of Getty Images and others.

_Id_.; _see also_ LCS' Rule 7.1 Corporate Disclosure Statement [Dkt. 34] ("LCS…is a wholly owned

subsidiary of Getty Images, Inc.").

Because there is undisputed personal jurisdiction over both Defendant Getty Images and

Alamy, Inc., there is also personal jurisdiction over LCS for the same causes of action arising out

of LCS' relationships and conduct occurring in active concert with the other named Defendants.

_See PDK Labs, Inc. v. Friedlander_, 103 F.3d 1105, 1111 (2d Cir. 1997) (Personal jurisdiction

exists over a defendant who "has purposefully availed himself of the New York forum by using

[an agent] in New York and apparently elsewhere for many years to advance his interest in his

unique 'product' through soliciting funds and negotiating royalty agreements.").

### B.        This Court Also Has Independent Personal Jurisdiction over LCS.

The _FAC_ also independently pleads that LCS has "actively contracted to supply goods

and/or services in the State of New York, and within this Judicial District, and actively conduct

business directly and through their representatives in the State of New York, and within this

Judicial District, in connection with the matters giving rise to this action."  _FAC_ at ¶ 44.  While

LCS cavalierly casts the Plaintiffs' allegations as "conclusory," the FAC details just some of LCS's actionable conduct that occurred (and is still occurring) in active concert and participation with the other Defendants, in this Judicial District and across New York State generally.

For example, the FAC alleges that LCS has contacted allegedly infringing users, falsely claiming these users have infringed Alamy's copyrights and demanding payment of settlements to Alamy to avoid lawsuit that neither Alamy nor LCS could lawfully pursue. FAC at ¶ 120. These letters and/or emails sent by LCS to allegedly infringing users of Ms. Highsmith's Photos threaten the recipient, stating that he/she must pay LCS's client, even if the user did not know that such use was allegedly infringing, and even if the user ceases and desists or even has already ceased and desisted from the allegedly infringing use. *Id*. at 121. Further, the FAC accuses LCS and the other Defendants of sending at least 3,000 such threat letters, to which the New York law firm Cuomo LLC has responded. FAC at ¶¶ 26-27. Discovery will demonstrate that many of LCS' extortionate and baseless threat letters were addressed to New York citizens, and that LCS derived substantial revenue from these New York activities.

To determine the propriety of exercising personal jurisdiction over a non-domiciliary in a case involving a federal question such as copyright infringement or false advertising/unfair competition, the Court must engage in a two-step analysis. *See Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 243-44 (2d Cir. 2007). First, the Court must apply the forum state's long-arm statute. *See id.* at 244; *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004). New York's long-arm statute provides, in relevant part:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent:

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> 2. commits a tortious act within the state ...; or
> 3. commits a tortious act without the state causing injury to person or property within the state ... if he
> > (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
> > (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce....

N.Y. C.P.L.R. § 302(a) (McKinney 2016). Section 302(a) also confers jurisdiction over individual corporate parents who supervise and control an infringing activity. *See Retail Software Servs. Inc. v. Lashlee,* 854 F.2d 18, 22 (2d Cir. 1988).

Several prongs of New York's long-arm statute are applicable here, as LCS is accused of transacting business to supply its infringing services/goods to New York consumers, and is committing tortious acts both within and outside the state by sending baseless threat letters to New York consumers and causing confusion, thus causing injury to the Plaintiffs here. Further, LCS is alleged to regularly do and solicit business here, and derives substantial revenue from goods and services rendered in New York, and should reasonably have expected that its acts would have consequences here.

Further, in order to satisfy the "arising from" requirement of the New York long-arm statute, there need only be "some articulable nexus between the business transacted and the cause of action sued upon." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 166 (2d Cir. 2010). Here, each cause of action against LCS is directly related to the Defendants' alleged commercial activities conducted in and directed to New York.

Because New York's long-arm statute clearly permits the lawful exercise of personal jurisdiction over LCS' conduct, the second step is for the Court to analyze whether the exercise of personal jurisdiction comports with the Due Process Clause of the United States Constitution. This analysis has two related components: the "minimum contacts" inquiry and the "reasonableness" inquiry. With respect to minimum contacts, the Court must determine whether a defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Here, in addition to LCS' commercial activities within New York and threat letters sent to New York consumers, LCS' website is also accused of displaying the Highsmith Photos and offering payment options and other interactive services. FAC at Ex. A. There can be no question that by doing so, LCS and the other Defendants (acting in concert with LCS) have purposefully availed themselves of the privileges of doing business in New York, and it is perfectly reasonable for each and every one of them to expect to be sued for such conduct here.

The Second Circuit Court of Appeals has also held that a defendant's fully interactive website reasonably subjects it to personal jurisdiction here. *Queen Bee* at 171. *Queen Bee* affirms the proposition that a defendant's undeniable use of a fully interactive website (such as each of Getty's, Alamy's, and LCS' websites here) that openly offers to transact business with New York-based consumers, and indeed does so on a regular basis, can constitute sufficient commercial activity to completely halt the argument that it could not reasonably expect to be sued here. *Queen Bee* at 171-2; *see also Hsin Ten Enterprise USA, Inc. v. Clark Enterprises*, 138 F.Supp.2d 449, 456 (S.D.N.Y. 2000) ("Generally, an interactive website supports a finding of personal jurisdiction over the defendant.").

Jurisdiction under § 302(a)(2) is properly asserted regardless of whether the amount of

services rendered or goods sold in New York constituted a greater or smaller portion of LCS' conduct nationally, *see, e.g., Houbigant, Inc. v. ACE Mercantile,* 914 F.Supp. 964, 979 (S.D.N.Y. 1995) ("Offering one copy of an infringing work for sale in New York ... constitutes commission of a tortious act within the state sufficient to imbue th[e] Court with personal jurisdiction over the infringer."), and regardless of whether LCS' services in New York were rendered through independent sales agents or independent contractors/agents. *See, e.g., Linzer v. EMI Blackwood Music, Inc.,* 904 F.Supp. 207, 214 (S.D.N.Y. 1995) ("Even if a non-domiciliary commits infringement through sales by independent brokers or retail merchants in New York, this constitutes tortious conduct within New York and subjects the defendant to jurisdiction under CPLR section 302."); *see also Diggs v. Musicland Grp., Inc.,* No. 96 CIV. 9642 (JSR), 1997 WL 195479, at *1 (S.D.N.Y. Apr. 22, 1997) (Rakoff, J.).

It is clear that, in order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only "make a *prima facie* showing that jurisdiction exists." *Penguin Grp. (USA) Inc. v. American Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010).  Where, as here, there has been no discovery, the plaintiff need only make "legally sufficient allegations of jurisdiction" through its pleading and affidavits in order to survive a motion to dismiss.  *Id.* at 35.  Clearly, given the level of detail and exhibits appended to the <u>FAC</u>, the Plaintiffs have already greatly exceeded that standard.

IX.     **ALAMY INC. AND ALAMY LTD. ARE PROPERLY SUBJECT TO PERSONAL JURISDICTION IN NEW YORK.**

Defendants Alamy Inc. and Alamy Ltd.[11] filed a joint motion and submitted a single brief, seeking to dismiss all claims against each of them  [Dkt. 55] ("Alamy Brief").[12]  Alamy Ltd. is Alamy, Inc.'s corporate parent, as Alamy Inc. is a wholly owned subsidiary of Alamy Ltd., and is a New York corporation.   *See* Alamy Ltd.'s Rule 7.1 Corporate Disclosure Statement. [Dkt. 35].

Alamy Inc. has its principal place of business at 20 Jay Street, Suite 848, Brooklyn, New York 11201, at which address Alamy Inc. accepted service of process on behalf of both Alamy entities.[13] [Dkt. 25].  Alamy Inc. does not dispute that this Court has personal jurisdiction over it, but its corporate parent, Alamy Ltd., apparently does.

Relevant to Alamy Ltd., the FAC specifically alleges that:

- Alamy Ltd. placed Highsmith Photos on the *Alamy.com* website – at least 500 of them.  FAC at ¶ 97.

- The *Alamy.com* website was, and is, fully interactive and used by consumers located in New York.  *Id*. at Ex. L.

- For each Highsmith Photo appearing on the *Alamy.com* website, both Alamy Inc. and Alamy Ltd. made those images available with false information regarding (*Id*. at ¶ 99):

---

[11] In their joint brief, Alamy Ltd. (but not Alamy Inc.) puts forward a series of unpleaded, undocumented rhetorical allegations regarding itself that should be ignored.  For example, Alamy Ltd. contends that it "treats its customers fairly" and the "world around it fairly."  Alamy Brief at 1.  Such "facts" are obviously in dispute, and Alamy Ltd.'s lack of citation to any evidence in the current record regarding these propositions means they are pure lawyer rhetoric and evidentiary nullities.

[12] In the *Alamy Brief*, Defendant Alamy Ltd.'s lawyers chose to use the defined term "Alamy" to describe that UK entity, but used the term "Alamy Inc." to describe its wholly-owned subsidiary.

[13] Alamy Ltd. was also served by International Registered Mail [Dkt. 37].

      (a)     the name and other identifying information about the author of the Highsmith Photo;

      (b)     the name of and other identifying information about the copyright owner of the Highsmith Photo; and

      (c)     the terms and conditions for use of the Highsmith Photo.

- On several pages on the *Alamy.com* website that could be accessed by consumers located in New York, Alamy Inc. and Alamy Ltd. placed underneath the Highsmith Photos false copyright ownership claims, such as, without limitation, "© Everett Collection Inc / Alamy Stock Photo." *Id.* at ¶ 101.

- Alamy Inc. and Alamy Ltd. also offered for sale on its website copyright licenses for using the Highsmith Photos, for example, with a "Presentation" license starting at $14.99, an "Editorial website" license starting at $24.99, and a "Magazines, newsletters and books" license starting at $69.99, to consumers located in New York. *Id.* at ¶ 103.

- Alamy Inc. and Alamy Ltd. also offer other "rights-managed" licenses for the Highsmith Photos to consumers in New York, which they now contend were "in the public domain." *Id.*, *Alamy Brief* [Dkt. 55] at 7-10.

Yet, Alamy Ltd. now contends that this Court utterly lacks personal jurisdiction over it, and declares that it could not have reasonably anticipated being haled into New York to defend itself for this course of conduct, demanding that all claims asserted against it should be dismissed in their entirety. *Alamy Brief* [Dkt. 55] at 21-23. Alamy Ltd. does not propose or suggest an alternative forum located in the United States. But it is clear from the pleaded facts that both Alamy Inc. and Alamy Ltd. are subject to this Court's personal jurisdiction for several independent reasons, and that Alamy Ltd. cannot evade this Court's scrutiny for its accused conduct.

### A.    *This Court Has Specific Jurisdiction over Alamy, Inc.'s Corporate Parent, Alamy Ltd.*

Exhibit A to the FAC, LCS' Letter, states that Defendant LCS was an agent representing ***Alamy Ltd.***: "Alamy is a privately owned online photo agency for stock imagery, video and live news. It was launched in 1999 and its headquarters are located on Milton Park, near Abingdon,

Oxfordshire, U.K." *See* Ex. A to FAC. Thus, it is squarely alleged that LCS' unlawful conduct to collect money from the Foundation (and New York consumers) was expressly done on Alamy Ltd.'s behalf, and done in active concert and participation with both Alamy Inc. and LCS/Getty.

The FAC also pleads that Alamy Ltd. has "actively contracted to supply goods and/or services in the State of New York, and within this Judicial District, and actively conducts business directly and through their representatives in the State of New York, and within this Judicial District, in connection with the matters giving rise to this action." FAC at ¶ 46. The Alamy Defendants admit in their brief that Alamy Inc. is "a sales office" for Alamy Ltd. *Alamy Brief* [Dkt. 50] at 3.

Putting aside general jurisdiction, "[s]pecific or conduct-linked jurisdiction ... 'depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation.'" *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853, 180 L. Ed. 2d 796 (2011); *see also Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'").

In other words, "to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum." *Walden*, 134 S. Ct. at 1122. Minimum contacts to support specific jurisdiction "exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being hauled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d

Cir. 2002)).

Specific jurisdiction exists "when the cause of action arises out of the very activity being conducted, in part," inside the forum. *Keeton v. Hustler Magazine, Inc.*, 465 U.S 770, 780 (1984). It may also exist even if none of the relevant conduct took place inside the forum, under the "effects test." *See Licci*, 732 F.3d at 173; *see also Walker*, 490 F.3d at 243 (describing "independent, if conceptually overlapping, methods of demonstrating minimum contacts"). "The effects test is a theory of personal jurisdiction typically invoked where ... the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173. For these claims, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant *expressly aimed its conduct at the forum*." *Id.* (emphasis added) (citing *Calder v. Jones*, 465 U.S. 783, 789 (1983)). Here, the allegations are that Alamy Inc. (a New York corporation) and Alamy Ltd. (its parent company) collaborated to commit the torts complained of by the Plaintiffs, which included sending baseless threat letters to New York consumers. Thus, specific jurisdiction over Alamy Ltd. is satisfied.

For example, the <u>FAC</u> alleges that LCS contacted allegedly infringing users, including consumers located in New York, falsely claiming these users have infringed Alamy Ltd.'s copyrights and demanding payment of settlements for Alamy Ltd. to avoid lawsuits that neither Alamy entity could lawfully pursue. <u>FAC</u> at ¶ 120.

These letters and/or emails sent by LCS to allegedly infringing users of Highsmith's Photos threaten the recipient, stating that he/she must pay Alamy Ltd., even if the user did not know that such use was allegedly infringing, and even if the user ceases and desists or even has already ceased and desisted from the allegedly infringing use. Further, the FAC accuses LCS

and the other Defendants of sending at least 3,000 such threat letters, to which the New York law firm Cuomo LLC has responded.  <u>FAC</u> at ¶¶ 26-27.  Discovery will demonstrate that many of LCS' baseless threat letters sent on behalf of Alamy Ltd. were addressed to New York citizens, and that both Alamy Inc. and Alamy Ltd. derived substantial revenue from these New York activities.

Several prongs of New York's long-arm statute are applicable here, as Alamy Ltd. is accused of transacting business to supply its infringing services/goods to New York consumers, and is committing tortious acts both within and outside the state by sending baseless threat letters to New York consumers and others, causing confusion, and causing injury to the Plaintiffs here.  Further, Alamy Ltd. is alleged to regularly do and solicit business here, and derives substantial revenue from goods and services rendered in New York, and should reasonably have expected that its acts would have consequences here.

In addition to Alamy Ltd.'s ongoing commercial activities within New York, and LCS' threat letters sent to New York consumers on behalf of Alamy, the *Alamy.com* website is also accused of displaying the Highsmith Photos and offering "copyright licenses."  There can be no question that by doing so, Alamy Ltd. has purposefully availed itself of the privileges of doing business in New York, and it is perfectly reasonable for Alamy Ltd. to expect to be sued for such conduct here.

As discussed *supra*, personal jurisdiction under § 302(a)(2) is properly asserted regardless of whether the amount of services rendered or goods sold in New York constituted a greater or smaller portion of a defendants' conduct nationally, *see, e.g., Houbigant,* 914 F.Supp. at 979, and regardless of whether Alamy Ltd.'s services in New York were rendered through its subsidiary, through independent sales agents or independent contractors/agents.  *See, e.g., Linzer,*

904 F.Supp. at 214 ("Even if a non-domiciliary commits infringement through sales by independent brokers or retail merchants in New York, this constitutes tortious conduct within New York and subjects the defendant to jurisdiction under CPLR section 302.").

**B.     *This Court Also Has General Jurisdiction over Alamy, Inc.'s Corporate Parent, Alamy Ltd.***

The Supreme Court in *Daimler AG v. Bauman* suggested that had MBUSA, the wholly-owned U.S. subsidiary of Daimler, been incorporated in California and had a principal place of business there, that both MBUSA and Daimler could be considered "at home" there. *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014).

In the instant case, Alamy Inc. is a New York corporation with a principal place of business at 20 Jay Street, Suite 848, Brooklyn, New York 11201. Because Alamy Ltd.'s wholly-owned subsidiary and corporate agent in the United States is organized under the laws of New York and has its principal place of business here, it can easily be considered "at home" in New York and subject to the general jurisdiction of the courts situated here.

## CONCLUSION

For all the foregoing reasons, the Plaintiffs respectfully request that this Court deny the Defendants' Motions to Dismiss, and permit the case to proceed in the ordinary course through discovery and trial.

September 23, 2016

Respectfully Submitted,

Joseph C. Gioconda, Esq. (JG 4716)
Joseph M. Forgione, Esq. (JF 8630)
GIOCONDA LAW GROUP PLLC
100 Park Avenue
16th Floor
New York, NY 10017
Telephone: (212) 235-1220
Facsimile: (888) 697-9665
*joseph.gioconda@giocondalaw.com*
*joseph.forgione@giocondalaw.com*

James R. Gourley, Esq.
Michael R. Steinmark, Esq.
CARSTENS & CAHOON, LLP
13760 Noel Road, Suite 900
Dallas, Texas 75240
Telephone: (972) 367-2001
Facsimile: (972) 367-2002
*gourley@cclaw.com*
*steinmark@cclaw.com*
(Admitted *Pro Hac Vice*)

*Attorneys for Plaintiffs,*
*Carol M. Highsmith, an Individual, and This*
*is America!, Inc., a not-for-profit*
*corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2016, I electronically transmitted the attached PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS, DECLARATION OF JAMES R. GOURLEY IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT PURSUANT TO FED.R.CIV.P. 12(b) and EXHIBITS A and B to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

> Attorneys for Defendant Getty Images (US), Inc.
> Kenneth L. Doroshow, Esq.
> Scott B. Wilkens, Esq.
> Erica L. Ross, Esq.
> JENNER & BLOCK LLP
> 1099 New York Avenue, N.W.,
> Suite 900
> Washington, DC 20001
> Tel:    (202) 639-6027
> Fax:    (202) 661-4855
> E:      KDoroshow@jenner.com
> E:      SWilkens@jenner.com
> E:      ERoss@Jenner.com
>
> Attorneys for Defendants Alamy, Ltd., Alamy, Inc.
>        and License Compliance Services, Inc.
> Lindsay W. Bowen, Esq.
> Nancy E. Wolff, Esq.
> Brittany Kaplan, Esq.
> COWAN, DEBAETS,
>        ABRAHAMS & SHEPPARD LLP
> 41 Madison Avenue, 38th Floor
> New York, New York 10010
> Tel.:   (212) 974-7474
> Fax:    (212) 974-8474
> E:      lbowen@cdas.com
> E:      nwolff@cdas.com
> E:      bkaplan@cdas.com

Joseph C. Gioconda, Esq.